**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

SEP 0 9 2022

TAMMY H. DOWNS, CLERK
By: _Kffaip_
DEP CLERK

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS

HELEN PROCTOR, on behalf of
herself and others similarly situated,

Plaintiff,

Thomas J. Vilsack, in his official
capacity as Secretary of Agriculture,

USDA RURAL DEVELOPMENT;

USDA    HOUSING    SERVICE
MICHAEL SCOTT; and SCOTT &
SONS CONSTRUCTION

Defendants.

Case No. 2:22-CV-157-BSM

This case assigned to District Judge Miller
and to Magistrate Judge Harris

## **COMPLAINT**

Helen Proctor, by and through her attorneys, refiles her complaint against the

named defendants after a 12/10/2021 order dismissing Case No. 2:20-CV-00154-BSM,

without prejudice, under Federal Rule of Civil Procedure 41(a)(2), and for her

causes of action states:

PRELIMINARY STATEMENT

1.     Plaintiff, Helen Proctor, is an elderly, uneducated, Black female with very low

income who, at all times relevant to this complaint, was a resident of Lake Village, Arkansas. For

purposes of this complaint, Plaintiff is a program-eligible applicant and her 3-acre home site is a

program-eligible property.

2.      The USDA Rural Development agency (RD) *found Mrs. Proctor to be a very low-income applicant, to own* a program-eligible property, and to be *eligible for a section 502 loan on and after 11/28/2006.*

3.      The section 502 program offers persons who do not currently own adequate housing, and who cannot obtain other credit, the opportunity to acquire, build, rehabilitate, improve, or relocate dwellings in rural areas.

4.      RD's certification, payment, and progress monitoring of Defendants Scott and Scott and Sons Construction Company (hereinafter the "Scott defendants") violated federal law intended to preserve Section 502 housing, improve the living condition of applicants such as Plaintiff, and protect the interests of the Agency and the American taxpayers, by failing to either insure that the Scott defendants were qualified to perform the construction contract at issue, to supervise the project to ensure ongoing and timely compliance by the Scott defendants with the contract, or to condition and withhold payment under the contract except where an inspection and determination had been made that defendants were in timely and proper compliance with each phase of the contract.  RD's actions also contravene its obligations to affirmatively further fair housing as required by the Fair Housing Act.

5. Because RD has failed and refused to fairly and humanely enforce its rules and regulations, acting arbitrarily and capriciously in doing so, including bad faith and abusive acts such as illegally foreclosing on Plaintiff's mortgage and intercepting Plaintiff's Social Security benefits (ostensibly in payment on the mortgage), Plaintiff has remained in grossly hazardous and substandard housing since 2009.

6.      Plaintiff seeks injunctive and declaratory relief and damages to ensure that she is made whole, the restructuring of her mortgage, the restoration of intercepted Social Security

benefits, and a requirement that RD makes her whole by authorizing and monitoring the construction of a decent single-family home.

## JURISDICTION AND VENUE

7. The Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, 1343, and 1361, in that plaintiffs' claims arise under the Fifth Amendment to the Constitution of the United States, the Administrative Procedure Act, 5 USC §706(1), and (2), 24 U.S.C. 3601, et seq., and the Amendments to the Fair Housing Act, 42 U.S.C. §3601, et seq. Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

8. The venue is proper under 28 U.S.C. § 1391 because at least one defendant herein, i.e., separate defendants Michael Scott and Scott and Sons Construction, are residents of this District and substantial participants in the events, acts, and omissions giving rise to the plaintiff's claims herein occurred in this venue.

## PARTIES

9. Plaintiff, Helen Proctor, is an elderly, uneducated, Black female with very low income who, at all times relevant to this complaint, was a resident of Lake Village, Arkansas. For purposes of this complaint, Plaintiff is a program-eligible applicant and her 3-acre home site is a program-eligible property. The Defendant agency *found Mrs. Proctor to be a very low-income applicant, to own* a program-eligible property, and to be *eligible for a section 502 loan on and after 11/28/2006.*

10. Defendant, Thomas J. Vilsack is the duly appointed and acting Secretary of Agriculture, and in his official capacity is responsible for the general superintendence of the Department of Agriculture and all of its sub-agencies, including Rural Development and the USDA

Housing Service. In particular, Secretary Vilsack is charged with ensuring that USDA employees and agencies follow USDA rules and regulations, federal law, and the United States constitution.

11.    Defendant Michael Scott was, at all times relevant to this complaint, a resident within the jurisdiction of this court, and held himself out as a qualified housing contractor.

12.    Defendant Scott & Sons Construction was, at all times relevant to this complaint, an entity or alleged entity doing business within the jurisdiction of this court.

## BACKGROUND AND COMMON FACTS

13.    This action involves allegations that even though Plaintiff is unsophisticated and uneducated, USDA, through its employees and agencies, failed and refused to provide Plaintiff with the homeowner education mandated by 7 CFR § 3550.52 and 7 CFR 3550.53; ignored the Agency Field Office Handbook in reviewing the building plans, awarding the contract, auditing expenditures, and inspecting contractor work; and acted intentionally or negligently to deny Plaintiff her right to contracts and other benefits under federal and state law. In particular, because Plaintiff had no contractor in mind, the Field Office Handbook required that RD explain the process and encourage and assist Plaintiff in obtaining competitive bids. Instead, local RD personnel recommended, condoned, and approved a sole bid from Michael Scott. Scott was approved even though he was inexperienced and objectively unqualified under RD rules.

14.    On October 21, 2008, RD finally approved Plaintiff for a loan of $101,500 for the construction of a single-family home under the section 502 program. Plaintiff signed a promissory note and the terms of the agreement, and on or about December 9, 2008, RD staff and Michael Scott met with Plaintiff for the required preconstruction conference. At the conference, Plaintiff and Scott signed the construction contract. At that conference, Scott agreed to follow, and RD agreed to enforce, the specifications of the Ron Litton architectural plans, RD

regulations, and appropriate building codes. See, October 21, 2008, Loan commitment additional items or conditions, attached as EXHIBIT K and adopted as part of this complaint. See, the December 9, 2008, Record of Preconstruction Conference attached as EXHIBIT J and adopted as part of this complaint. See also, Ron Litton House Plan for Proctor attached as EXHIBIT M and adopted as part of this complaint.] The parties agreed that construction would begin on January 15, 2009, and be completed by June 15, 2009. USDA did not advise Plaintiff that Scott lacked a contractor's license, and had no experience building single-family homes, though licensure and experience are required by USDA rules.

15.    Neither RD nor Scott explained to Plaintiff why Construction was delayed for two and one-half months. On or about March 20, 2009, Plaintiff, Scott, and RD signed a contract change order, and Plaintiff was advised that the delay had been necessary while Scott obtained a contractor's license. See, March 18, 2009, Contractor's License for Scott & Sons Construction Co., backdated to 11/29/2008, attached as EXHIBIT H and adopted as part of this complaint; and, See, March 23, 2009, Contract Change Order, modifying start date of construction until March 23, 2009, attached as EXHIBIT I and adopted as part of this complaint

16.    Almost immediately, it became clear that Scott could not or would not conform to the contract timelines, building specifications, and applicable codes. The agency refused to give credence to Plaintiff's complaints about the defective workmanship, the failure to follow the plan specifications, and the refusal to adhere to the timetable. In particular, USDA, through its agencies and employees repeatedly and consistently violated and/or ignored USDA rules and regulations aimed at protecting the interests of the agency and the borrower. USDA knew that the violations existed, and was made aware early on both that USDA "inspections" were not addressing the work on the ground AND that the violations would harm the Plaintiff. See,

September 15, 2016, Affidavit of Helen J. Proctor, submitted as part of the OASCR investigation

of a May 25, 2015 complaint on her behalf against USDA RD (AR), attached as EXHIBIT A and

adopted as part of this complaint.

17.    Item 3 of a 2015 USDA OHRM Investigation Referral states, in part:

… According to the Construction Contract signed by Ms. Proctor and Mr. Scott
on December 9, 2008, Mr. Scott would receive partial payments not to exceed
60% of the loan and would upon completion of the construction "in accordance
with the bid submitted by Scott & Son Construction dated 9/02/08; in accordance
with Form 1924-2, Description of materials; in accordance with plans from Ron
Litton dated 04/14/08. " Mr. Scott did receive all three payments plus a separate
check of $1800 to complete Ms. Proctor's septic system. The structure that is
completed does not meet the requirements of Mr. Litton, the architect's plan, and
does not have a septic system or water system. RD-AR staff is required to
complete inspections on the structure prior to the loan originator issuing a check
based on the percentages of the home being completed. The RD-AR staff
completed these inspections, however, it appears the two inspectors did not note
during the inspection the contractor's failure to follow the architect's plan -- a
requirement in the contract agreement -- and provided the approval for release of
funds without verifying.

See, EXHIBIT K, supra. See, April 9, 2015, OHRM Personnel Misconduct Investigation

Referral, attached as EXHIBIT B and adopted as part of this complaint. See, also the June 16,

2010, letter from architect Ron Litton to Hal Palmer, attached as EXHIBIT C and adopted as part

of this complaint; See, also the August 12, 2010, letter from Andy Branton, Staff Architect in the

State Fire Marshal's Office, to Lawrence McCullogh, attached as EXHIBIT D and adopted as

part of this complaint; See, also the November 19, 2009, Plumbing Inspection report from

inspector Stan Massanelli of the Arkansas Department of Health to the contractor and sub-

contractors regarding numerous material code violations, attached as EXHIBIT E and adopted as

part of this complaint; See, also the November 24, 2009, Summary Letter Arkansas Mechanical

Inspector Doug Pearson to the HVAC sub-contractor noting violations in the HVAC installation,

and that the sub-contractor claimed that he had not been paid by Scott, attached as EXHIBIT F

and adopted as part of this complaint; and, See, also the letters and emails from architect attorney Donald Campbell to Lawrence Mcullough and others addressing the problems with installing a septic system, attached as EXHIBIT G and adopted as part of this complaint.

18.     The workmanship deficiencies (only a sample of which are addressed in, for example, Plaintiff's Affidavit, EXHIBIT A; letter from architect Ron Litton to Hal Palmer, EXHIBIT C; and the architect attorney Donald Campbell letter, EXHIBIT L, above) OBJECTIVELY made and make the home "deficient", with "major hazards", and therefore uninhabitable (no sewer system, [no connection to potable] water, electrical noncompliance, failure to follow the architect's plan. See, EXHIBIT B, Item 5 - Additional information identified in the review:

19.     Mr. Lawrence McCullough, Arkansas State Director for RD, justified the failure of RD-AR to demand that the contractor fix the deficiencies by stating that USDA is not a party to the contract. However, according to the Rural Development (RD) Direct Single Family Housing Loans and Grants Field Office Handbook Hb-1-3550 and RD form 1924f, RD-AR has oversight responsibilities to ensure that money provided through a contract where RD is a party is utilized per the terms of that contract and per agency rules and regulations, as well as ensuring that inspections completed are thorough and accurate to the specifications provided in the construction agreement. However, as is made clear from EXHIBIT B, USDA employees from local staff to the various Arkansas State Directors belittled Plaintiff's complaints or justified misfeasance or malfeasance in the inception, execution, and performance of the construction contract.

20.     Field Office Handbook Hb-1-3550, Section D, "Changes During Construction", stipulates

> "If changes to the approved drawings and specifications are required during
> construction, the applicant and contractor must sign Form RD 1924-7, Contract
> Change Order. All modifications must be certified on Form RD 1924-25, Plan
> Certification, if the modification is regulated by the applicable development
> standard. Before signing it, however, the Loan Approval Official must review and
> sign the change order to ensure that the change fits within the approved loan
> amount."

The only change order Plaintiff was aware of was the one forced on her by a delay caused by

Scott's being unlicensed. The OARSC report notes, "The contractor did not notify RD-AR or

Ms. Proctor of the changes made to the architectural plan." Again, EXHIBIT B explicitly shows

that Ms. Proctor documented and reported to RD-AR staff numerous glaring and material

changes and defects even before the June 12, 2009, written notification which was acknowledged

by Mr. Larry Kindle, Area Director for RD, in an email to Mr. Palmer on July 28, 2009. And,

again as noted, RD-AR only acknowledged the earlier notification when Mr. Palmer, Plaintiff's

son, and attorney-in-fact intervened to raise concerns regarding the lack of construction progress

or compliance. At the request of Mr. Palmer, Ron Litton, the architect, in a letter dated June 16,

2010, noted a number of the material and detrimental changes or errors which Scott had made

without notice or explanation to Plaintiff or the RD-AR staff. Mr. Kindle deemed the

construction work to comply based on the Agency's last inspection completed on June 11, 2009

(email from Mr. Kindle to Mr. Palmer on 7-28-09). In her affidavit, Plaintiff swore that RD staff

deemed that Plaintiff was being "nit-picky", for demanding a house better than she deserved.

However, even USDA personnel, in the referral in EXHIBIT B, found the contractor's changes

to be structural and detrimental, and NOT merely aesthetic.

     21. From 2009 until late 2018, even after the contract was canceled and the mortgage was

accelerated, RD employees at various levels indicated that Plaintiff's complaints were still under

review and that consideration was being given to completing the construction project. However,

under the Administrative Procedure Act and USDA rules and regulations, on 06-18-2019 the USDA

Office of the Assistant Secretary for Civil Rights made a decision denying the Plaintiff's claims in

docket number RD–15–7185. The plaintiff timely appealed that decision. Sometime after 2-19- 2020,

the plaintiff received notice that the Agency had affirmed the earlier decision, and denied her appeal

in docket number RD–15–7185. The Plaintiff filed her complaint in Federal Court initially on July 21,

2020. An order of non-suit was entered on December 10, 2021. The client now refiles her request

for redress.


RELEVANT GUIDELINES

22.      This case involves the operation of section 502, the single-family housing program

operated by the Rural Housing Service of USDA Rural Development. The mission of that program

is:

> *The purpose of the direct RHS single family housing loan programs is to provide low- and very low-income people who will live in rural areas with an opportunity to own adequate but modest, decent, safe, and sanitary dwellings and related facilities. The section 502 program offers persons who do not currently own adequate housing, and who cannot obtain other credit, the opportunity to acquire, build, rehabilitate, improve, or relocate dwellings in rural areas.*
> *Section 502 funds may be used to buy, build, rehabilitate, improve, or relocate an eligible dwelling and provide related facilities for use by the borrower as a permanent residence. ....*

7   CFR § 3550.2 and § 3550.52

23. Addressing the requirements of sections 502 and 504 of the Housing Act of 1949, as

amended, concerning Direct Single Family Housing Loans and Grants, 7 CFR § 3550.10 includes

the following definitions:

> *Deficient housing. A dwelling that lacks complete plumbing; lacks adequate heating; is dilapidated or structurally unsound; has an overcrowding situation that will be corrected with loan funds; or that is otherwise uninhabitable, unsafe, or poses a health or environmental threat to the occupant or others.*

*Hazard. A condition of the property that jeopardizes the health or safety of the occupants or members of the community, that does not make it unfit for habitation. (See also the definition of major hazard in this section.)*

*Major hazard. A condition so severe that it makes the property unfit for habitation. (See also the definition of hazard in this section.)*

*New Dwelling or unit. A dwelling that is to be constructed, or a dwelling that is less than 1 year old as evidenced by an occupancy permit, certificate of occupancy or similar document issued by the local authority and has never been occupied.*

*Program-eligible applicant. Any applicant meeting the eligibility requirements described in § 3550.53.*

*Program-eligible property. A property eligible to be financed under this part, as determined by the criteria listed in §§ 3550.56 through 3550.59.*

*RHS. The Rural Housing Service of the U.S. Department of Agriculture, or its successor agency, formerly the Rural Housing and Community Development Service (RHCDS), a successor agency to the Farmers Home Administration (FmHA).*

*RHS employee. Any employee of RHS, or any employee of the Rural Development mission area who carries out grant or loan origination or servicing functions for the section 502 or 504 programs.*

*Very low-income. An adjusted income limit developed in consultation with HUD under 42 U.S.C. 1437a(b)(2)(D).*

24.   Under *7 CFR § 3550.11*, the State is required to assess the availability of homeowner education, with the understanding that *very low-income* loan applicants will NORMALLY be poor, unsophisticated, and unfamiliar with the intricacies of home building and ownership. Under *7 CFR § 3550.52*, the loan funds may be used to cover the costs of homeowner education. Under *7 CFR 3550.53(i)*, exceptions to the homeowner education requirement **MAY** be reviewed and granted on an individual case-by-case basis. In particular, although the training may be tailored to the identified needs of an

applicant, the *State Director must ensure, if at all possible), that the applicant receives a letter or certificate of completion to document that the borrower has satisfactory knowledge of these minimum topics*:

> (1) Preparing for homeownership (evaluate readiness to go from rental to homeownership),
> (2) Budgeting (pre- and post-purchase),
> (3) Credit counseling,
> (4) Shopping for a home,
> (5) Lender differences (predatory lending),
> (6) Obtaining a mortgage (mortgage process, different types of mortgages),
> (7) Loan closing (closing process, documentation, closing costs),
> (8) Post-occupancy counseling (delinquency and foreclosure prevention),
> (9) Life as a homeowner (homeowner warranties, maintenance and repairs),

25.  Under 7 CFR § 3550.57, *New dwelling* Construction must meet the requirements in 7 CFR part 1924, subpart A. Under that subpart, section 5.5 of the Field Office Handbook requires certification that septic and water service meet appropriate national, state, or local codes.

26.  Under *7 CFR § 1924.4*, the following definitions are relevant to this cause of action:

(a) **Construction.** *Such work as erecting, repairing, remodeling, relocating, adding to or salvaging any building or structure, and the installation or repair of, or addition to, heating and electrical systems, water systems, sewage disposal systems, walks, steps, driveways, and landscaping.*
(b) **Contract documents.** *The borrower-contractor agreement, the conditions of the contract (general, supplementary, and other), the drawings, specifications, warranty information, all addenda issued before executing the contract, all approved modifications thereto, and any other items stipulated as being included in the contract documents.*
(c) **Contractor.** *The individual or organization with whom the borrower enters into a contract for construction or land development, or both.*
(d) **County Supervisor and District Director.** *In Alaska, for the purpose of this subpart, "County Supervisor" and "District Director" also mean "Assistant Area Loan Specialist" and "Area Loan Specialist," respectively. The terms also include other qualified staff who may be delegated responsibilities under this subpart in accordance with the provisions of subpart F of part 2006 (available in any Agency office).*

*(e) Date of commencement of work.* The date established in a "Notice to Proceed" or, in the absence of such notice, the date of the contract or other date as may be established in it or by the parties to it.

*(f) Date of substantial completion.* The date certified by the Project Architect/Engineer or County Supervisor when it is possible, in accordance with any contract documents and applicable State or local codes and ordinances, and the Agency approved drawings and specifications, to permit safe and convenient occupancy and/or use of the buildings or other development.

*(g) Development.* Construction and land development.

*(h) Development standards.* Any of the following codes and standards:

*(1) A standard adopted by the Agency for each state in accordance with § 1924.5(d)(1)(i)(E) of this subpart.*

*(2) Voluntary national model building codes (model codes).* Comprehensive documents created, referenced or published by nationally recognized associations of building officials that regulate the construction, alteration and repair of building, plumbing, mechanical and electrical systems. These codes are listed in exhibit E of this subpart.

*(3) Minimum Property Standards (MPS).* The Department of Housing and Urban Development (HUD) Minimum Property Standards for Housing, Handbook 4910.1, 1984 Edition with Changes. (For One and Two Family Dwellings and Multi-Family Housing).

27.          (10) *Obtaining bids and selecting a contractor.*

…

*(iii) When an applicant has a proposed development plan and no contractor in mind, competitive bidding will be encouraged. The applicant should obtain bids from as many qualified contractors, dealers or tradespeople as feasible depending on the method and type of construction.*

*(iv) If the award of the contract is by competitive bidding, Form RD 1924-5, "Invitation for Bid (Construction Contract)," or another similar invitation bid form containing the requirements of subpart E of part 1901 of this chapter, may be used. All contractors from whom bids are requested should be informed of all conditions of the contract including the time and place of opening bids. Conditions shall not be established which would give preference to a specific bidder or type of bidder. When applicable, copies of Forms RD 1924-6 and RD 400-6, "Compliance Statement," also should be provided to the prospective bidders.*

28.       (11) *Awarding the contract.* The borrower, with the assistance of the County Supervisor or District Director, will consider the amount of the bids or proposals, and all conditions which were listed in the "Invitation for Bid." On the basis of these considerations, the borrower will select and notify the lowest responsible bidder.

*(i) Before work commences, the County Supervisor, District Director or other Agency employee having knowledge of contracts and construction practices will hold a preconstruction conference with the borrower(s), contractor and architect/engineer (if applicable). The purpose of the conference is to reach a mutual understanding of each party's responsibilities under the terms and conditions of the contract documents and the loan agreement during the construction and warranty periods. Form RD 1924-16, "Record of Preconstruction Conference," may be used as a guide for an agenda.*

*(ii) A summary of the items covered will be entered in the running case record.*

*(iii) The contract will then be prepared, signed and copies distributed in accordance with the FMI for Form RD 1924-6.*

*(iv) After a borrower/contractor's contract or subcontract in excess of $10,000 is received in the Agency County or District Office, the responsible Agency official will send within 10 calendar days of the date of the contract or subcontract, a report similar in form and content to exhibit C of subpart E of part 1901 of this chapter to the Area Director, Office of Federal Contract Compliance Programs, U.S. Department of Labor, at the applicable address listed in exhibit E, subpart E of part 1901 of this chapter. The report must contain, at least, the following information: contractor's name, address and telephone number; employer's identification number; amount, starting date and planned completion date of the contract; contract number; and city and DOL region of the contract site. The information for this report should be obtained from the contractor when the contract is awarded.*

29.          (12) ***Payments for work done by the contract method.***

*(i) Payments will be made in accordance with one of the following methods unless prohibited by state statute, in which case the State Director shall issue a State Supplement to this section:*

   ...

*(B) The "Partial payments not to exceed 60 percent of the value of the work in place" payment method will be used when the contractor does not provide surety bond, a letter of credit, or deposits.*

   ...

*(ii) When Form RD 1924-6 is used, the appropriate payment clause will be checked and the other payment clauses not used will be effectively crossed out.*

*(iii) When a contract form other than Form RD 1924-6 is used, the payment clause must conform with paragraph (a)(12)(i) of this section and the appropriate clause as set forth in Form RD 1924-6.*

*(iv) The borrower and FmHA or its successor agency under Public Law 103-354 must take precautionary measures to see that all payments made to the contractor are properly applied against bills for materials and labor procured under the contract. Prior to making any partial payment on any contract where a surety bond is not used, the contractor will be required to furnish the borrower and the FmHA or its successor agency under Public Law 103-354 with a statement showing the total amount owed to date for materials and labor procured under the contract. The contractor also may be required to submit evidence showing that previous partial payments were applied properly. When the borrower and the County Supervisor or District Director have reason to believe that partial payments may not be applied properly, checks may be made jointly to the contractor and persons who furnished materials and labor in connection with the contract.*

*(v) **When partial payments are requested by the contractor and approved by the owner, the amount of the partial payment will be determined by one of the following methods:***

*(A) **Based upon the percentage completed as shown on a recently completed and properly executed Form RD 1924-12, "Inspection Report."***

*(B) When the structure will be covered by an insured 10-year warranty, the insurer's construction inspector must provide the Agency with any available copies of inspection reports showing percentage of completion immediately after the inspections are completed. **To make partial payments when copies of inspection reports are not available, the responsible Agency official will make the inspections or will be guided by the provisions of § 1924.6(a)(12)(v)(C) of this subpart. If further assurance is deemed necessary to justify partial payments, the Agency official may make onsite inspections or require additional information.***

*(C) Based upon an application for payment containing an estimate of the value of work in place which has been prepared by the contractor and **accepted by the borrower** and the Agency. When the contract provides for partial payments for materials satisfactorily stored at the site, the application for payment may include these items. **Prior to receiving the first partial payment, the contractor should be required to submit a list of major subcontractors and suppliers and a schedule of prices or values of the various phases of the work aggregating the total sum of the contract such as excavation, foundations, framing, roofing, siding, mill work, painting, plumbing, heating, electric wiring, etc., made out in such form as agreed upon by the borrower, the Agency, and the contractor. In applying for payments, the contractor should submit a statement based upon this schedule. See exhibit A of this subpart for guidance in reviewing the contractor's schedule of prices and estimating the value of the work in place.***

TIMELINE

30.    USDA employees have neither acted to protect the agency's interest in the loan

nor ever acted to assist Plaintiff in holding Scott accountable, in having any of the deficiencies

fixed, or in helping Plaintiff obtain decent housing. As is made clear by the following timeline,

USDA and RD have consistently denigrated and blamed Plaintiff for the ill-treatment she

received:

    a. Plaintiff was successively conditionally approved for Section 502 loans on:
        i. 11/28/2006 approved for a loan of $80,000.00 by Betty Finks Leonard;
        ii. 02/12/2008 approved for a loan by Sherry A. White; and
        iii. 10/21/2008 approved for a loan of $101,500 by Larry Kindle.

    b. On behalf of RD, Larry Kindle, the Area Director signed a commitment for loan #36197669 on 10-21-2008. That commitment included the following:
        i. No requirement or provision for homeowner education
        ii. No requirement or provision for a builder warranty
        iii. Failure to emphasize or enforce Field Office Handbook requirements that plans show approved specifications for a water system and waste disposal
    c. Shortly after the initial conditional loan approval, Michael Scott (who was unknown to Plaintiff) contacted Plaintiff alleging that he was sent by RD to construct her house.
    d. RD initially approved Michael Scott as Plaintiff's contractor – approximately 08/05/2008. However, RD acknowledges interacting with Scott only after 09/02/08.
    e. As noted in paragraph 28, on 11/09/2008, RD held the required overview meeting and set start and completion dates. The meeting was perfunctory and the report was uninformative.
    f. On numerous occasions, from just after the start of work until the contract was canceled, Plaintiff requested that the contract include a 10-year warranty. Michael Scott refused to provide a warranty. Notwithstanding the quality of work that Scott had exhibited and continued to exhibit, Larry Kindle not only refused to require a warranty, but also told Plaintiff that a warranty was not required by RD regulations, and was not needed.

    The start date was delayed because Michael Scott did not have a contractor license. *RD never told Plaintiff any reason for the delay in the start date. There was also no showing that Michael Scott is the same entity as Scott & Sons Construction Co. **See, EXHIBIT H, supra.***

    g. Although Plaintiff was never shown the contractor license, RD permitted construction under the contract to begin on 03/23/2009. It should be noted that when an investigative reporter for Little Rock station KATV 7 asked the State Director whether Scott was approved even though Scott was not licensed, the USDA response was that "he was licensed", presumably an accurate statement at the time of the question – but non-responsive to whether the guidelines were violated in the approval. ***See, item 4 on the fourth page of Exhibit B, supra.***
    h. Plaintiff began complaining about work quality shortly after the construction began. Although the plaintiff or her representatives made numerous complaints in person or by phone, the following complaints were more detailed and in writing:
        i. – Approximately 05/29/2009. [cashier check was given to Scott for Septic System and related services during the time of closing. Where is the septic system?]

ii. – Approximately 06/10/2009. [At closing borrower signed documents regarding the start date and home plans; why aren't timelines and plans followed?]

iii. – Approximately 06/10/2009. [Plumbing errors with changes approved by RD. Plaintiff was not aware of changes to the plan that included both bathrooms and the master bedroom areas as they are not being constructed according to the plan]

iv. – Approximately 06/10/2009. [Contractor misplaced his plans then took Plaintiff's plan and still did not use the certified and approved plan to build]

v. – Approximately 06/10/2009. [Marisa Harris called asking about the septic system after construction had started. This seemed late in the process to be asking or finding out about the septic system requirements. What about the 12/2008 cashier check?]

vi. – Approximately 06/19/2009. [Contractor indicated that his bid did not include two full baths. Asked Marisa whether this was true. Asked that the bathroom finishing and framing be a focus during the inspection.]

vii. – Approximately 06/19/2009. [It appears the contractor thinks that he can leave out the shower and not complete the wall with waterproof products.]

viii.     Approximately 07/24/2009. [When is the next inspection? Borrower asked to be included.]

ix. – Approximately 07/24/2009. [Contractor making random changes without consulting Borrower.]

x. – Approximately 07/24/2009. [Water was disconnected leaving Borrower without water. Borrower family had to reconnect.]

xi. – Approximately 07/24/2009. [Borrower's utility bills went double; learned that the contractor had been using her power to build.]

xii. – Approximately 07/24/2009. [Informed RD that the project was 'not going well. Concerns with plumbing items and the dimensions of the house.]

xiii.     – Approximately 07/24/2009. [Progress concerns that the Contractor may not be finished in August.]

xiv.     – Approximately 07/24/2009. [What happens when the contractor does not complete the project as promised?]

xv. – Approximately 08/05/2009. [email from Hal Palmer was sent to both Larry Kindle and Marisa Harris on August 5, 2009, at 6:44 AM in response to an email sent from Larry Kindle dated July 28, 2009, at 11:41 AM. ****

[SEE, IN PARTICULAR, Palmer email to Kindle, et al, dated July 24, 2009; Kindle email to Palmer, July 28, 2009; and Palmer email to Kindle, et al, dated August 5, 2009, *attached as EXHIBIT I and adopted as part of this complaint]*

i.   The RD staff responded to the complaints by saying "The agency is not a party to the contract. The parties should work together". *See, e.g., Exhibit B, item 4, pages 2-3, supra.*

j.   Larry Kindle and other RD staff badgered Plaintiff to accept shoddy work and work which violated plumbing, electrical, and building codes and specific provisions of the RD Field Office Handbook. Larry Kindle specifically said Plaintiff did not need such a good house, and should not be complaining. On many occasions, by phone and in person, RD staff

threatened to end the contract and make Plaintiff pay for the unfinished project – or lose her land. *See, generally, Exhibit A, supra.*

k.  The RD staff never addressed the extreme deviations from the blueprint and the contract.

l.  The RD staff never addressed the visible unsafe wiring, the walls which did not match, Scott's failure to obtain percolation tests, Scott's failure to fix bathrooms, the failure to connect the house plumbing to a water source, and the failure to install a compliant septic system, nor even to apply for a waste disposal plan approval by the Health Department.

m.  Although *502 Program dwelling units must have working potable water and waste disposal systems*, and the Field Office Handbook requires certification AT CLOSING that septic and water service meet appropriate codes, RD, even though they had given Scott a check specifically for installing a septic system, after the fact, argued the problem was that Ron Litton's plans didn't include a septic system. *See, Exhibit K, supra.* Compare, August 26-27, 2010, emails among Attorney Donald K. Campbell, Larry Kindle, and Lawrence McCullough, et al., justifying the failure to obtain a percolation test. See, *Exhibit L.*

n.  The RD staff paid Scott for work far above the effective level of completion.

o.  While arguing that septic was not included, the RD staff had on 12/09/2008 provided Michael Scott with a check for $1800, ostensibly to install a septic system. The RD staff gave Plaintiff only nominal notice and no opportunity to object or consent while providing Scott with two partial payments ($10,150 on 05/18/2009 and $24,476 on 06/22/2009). The RD staff provided Scott with another partial payment ($11,343 on 08/25/2009) without even nominal notice to Plaintiff. All of the payments were made after Plaintiff had begun prolonged and vociferous objections to Scott's workmanship. None of the payments required Scott to provide an accounting or reconciliation. EXHIBIT B shows that there was no legitimate dispute on these facts. Documentation notwithstanding, Mr. Kindle in correspondence with Mr. Palmer wrongly asserts that Plaintiff can't complain because she signed all three checks. Plaintiff's affidavit [Exhibit A] shows that even her signature does not mean she was afforded a real opportunity to object or to be considered.

p.  After Scott refused to correct numerous errors or to properly connect the plumbing, or install a septic system, Plaintiff demanded that the contract be canceled.

q.  Plaintiff agreed to continue with Scott if RD required conditions to ensure compliance.

r.  RD refused to institute new conditions, or enforce existing compliance conditions.

s.  RD canceled the contract but did not require Scott to reimburse for overpayments, work with Plaintiff to obtain a replacement contractor, or follow the independent inspector's recommendation that RD should add funds, at no cost to Plaintiff, to correct the construction errors and overruns that were in no way caused by Plaintiff.

t.  RD required Plaintiff to find a new contractor by a date certain.

u.  Plaintiff timely obtained proposals from 4 contractors, but RD refused, without good cause, to approve any of them or to require compliance conditions.

## FIRST **CLAIM FOR RELIEF**
Breach of Contract by RD

31.      Plaintiff adopts and incorporates each of the allegations made in paragraphs 1-30 as though fully set out in this Claim for Relief.

32.      On or about October 21, 2008, Larry Kindle executed a Section 502 loan commitment promising to provide Plaintiff a loan for $101,500, with specific terms conditioned on the statutes, rules, and regulations mandated for the Section 502 Program by the 1949 Housing Act, as amended. The mortgage and the related papers agreed to were signed by Plaintiff and Larry Kindle on or about December 9, 2008. The parties orally and in writing agreed that (a) Plaintiff would commit her land, her credit, and her best efforts to facilitate the timely construction of a single-family home based on an agreed blueprint, and according to agreed construction standards and local codes. (b) On behalf of RD, and as specifically laid out in the relevant Field Office Handbook, Kindle orally and in writing made a commitment to provide the construction funds, professional monitoring, and oversight of the construction progress, and project management, particularly as to cost and product marketability, in support of both Plaintiff's and RD's interests.

Both Kindle and Plaintiff were adults, authorized to act, and acted within the scope of their authority.

33.    Plaintiff performed her obligations as completely and satisfactorily as she was permitted to until Kindle refused, without cause, to perform the required monitoring, oversight, and project management functions mandated by the Field Office Handbook. Careful consideration of the actual work on the ground and documentation provided by Plaintiff, make abundantly clear that RD violated its obligations under the law and the loan commitment.

34.    Rather than attempt to make matters right as recommended by the independent inspector, Kindle's superiors punished Plaintiff by first refusing to dismiss the wrongdoing contractor, then refusing to work with Plaintiff or giving any credence to replacement contractors suggested by her. In addition, RD foreclosed the mortgage and intercepted Plaintiff's Social Security benefits payments, leaving her still in grossly deficient housing and largely destitute.

35.    As a result of RD's intentional failure to follow its rules and the law, Plaintiff has been harmed financially, has had to live for many years in grossly deficient housing, and has been harmed in her reputation.

36.    Because RD personnel and management have demonstrated bad faith in the inception and performance of the contract, Plaintiff is entitled to punitive damages, beyond and in addition to other damages claimed herein.

## SECOND CLAIM FOR RELIEF
### Breach of Contract by Scott and Scott and Sons Construction Company

37.    Plaintiff adopts and incorporates each of the allegations made in paragraphs 1-30 as though fully set out in this Claim for Relief.

38.    The construction contract was signed by both Plaintiff and Scott, for himself and Scott and Sons Construction Company, in the presence of Kindle and/or other RD employees. The parties orally and in writing agreed on what work was to be done, where, and to what standard; what the total price was; when the work was to be done; who was to do the work; who was to pay for the work, on what schedule and based on what standards of performance.

39.    Plaintiff performed her obligations as completely and satisfactorily as she was permitted to until Scott, for himself and Scott and Sons Construction Company refused, without cause, to conform to local codes and building standards as required by the written contract, refused to correct obvious and material errors, refused to stand by or guarantee his work, and received payments which he had not earned.

40.    As a result of Scott and Sons Construction Company's intentional failure to follow the contract, Plaintiff has been harmed financially, has had to live for many years in grossly deficient housing, and has been harmed in her reputation. Scott should be made to disgorge the unearned payments made to him by the RD staff and to pay Plaintiff for the damage done to her.

41.    Because Defendants Scott and Scott & Sons Construction Company have demonstrated bad faith in the inception and performance of the contract, Plaintiff is entitled to punitive damages, beyond and in addition to other damages claimed herein.

**THIRD CLAIM FOR RELIEF**
**RD's Administration of the Section 502 Program is Arbitrary and Capricious.**

42.    Plaintiff adopts and incorporates each of the allegations made in paragraphs 1-30 as though fully set out in this Claim for Relief.

43.     Under pressure from, and at the direction of, USDA employees Plaintiff agreed to the hiring of Michael Scott and Scott & Sons Construction Company to build her house subject to RD regulations.

44.     Plaintiff made it clear to the RD staff that she did not understand the contracting process, that she knew nothing about Scott's qualifications or reliability, nor did she understand all of the intricacies of the agreed-upon architecture plan.

45.     RD staff failed and refused to follow USDA rules and regulations or to protect Plaintiff's or the government's interests, even after repeated complaints by Plaintiff and her agents that Scott and RD staff were ignoring the construction contract terms, that the house as it was being built would be untimely, over-priced, deficient, and uninhabitable.

46.     Rather than inspect and audit the construction process in the manner required by regulation and statute, RD staff attempted to isolate Plaintiff, bullied and belittled her, and consistently refused to recognize Hal Palmer, her son, as her agent, even though Plaintiff on numerous occasions told them, and they had records showing his appointment as the attorney-in-fact authorized to speak for Plaintiff.

47.     The work performed by Michael Scott and Scott & Sons Construction Company was materially and obviously in violation of the contract and failed to meet any of the codes under which USDA regulations required that RD staff judge them.

48.     Michael Scott and Scott & Sons Construction Company failed to complete the house as agreed upon, including, among many documented defects, failing to make any arrangements for potable water and installation of a waste disposal system.

49.    Plaintiff constantly complained to RD management that the whole point of the loan was to move Plaintiff from *deficient housing* which "lacks complete plumbing; ...; or that is otherwise uninhabitable, unsafe ...," to NON-deficient housing. Yet, notwithstanding the ongoing complaints, RD staff failed to find errors during their inspections, falsified the effective level of project completion, and belittled Plaintiff's complaints of shoddy work and violations of the contract, relevant codes, and standards of construction. As the scheduled completion date approached, there was no question that the project was incomplete and far behind schedule. Still, days before the scheduled completion date, RD staff paid Scott a substantial portion of the total loan balance, without notice to or consent from Plaintiff.

50.    RD staff distributed funds on one or more occasions directly to Scott without Plaintiff's approval, and on other occasions without acknowledging Plaintiff's vociferous objections, in violation of 7 CFR part 1924 and other relevant rules and regulations.

51.    Scott failed and refused to return to correct defects and/or to reimburse Plaintiff for overpayments, and the plaintiff terminated his contract.

52.    Due to RD advancing funds to Scott that had not been earned the pool of funds for the plaintiff to hire another contractor to complete the home was greatly diminished.

53.    Plaintiff has been unable to complete the construction of her house. This has caused her great stress and has caused her to reside in unhealthy and unsafe conditions.

54. USDA, through RD, has, notwithstanding the above facts, foreclosed the 12/9/2008 mortgage, intercepted Plaintiff's Social Security benefits allegedly to repay the disputed debt, and thereby ruined Plaintiff's option to ever afford suitable housing.

55. USDA should be mandated to work with Plaintiff to restructure the mortgage, in finding a qualified contractor, and to enforce the independent inspector's recommendation that RD adds funds, at no cost to Plaintiff, to correct the construction errors and overruns that were in no way caused by Plaintiff.

56. USDA should be required to pay actual and punitive damages resulting from its hijacking of Plaintiff's social security benefits, its overpayments to and failure to monitor Scott, and for mental anguish, pain, and suffering caused by USDA in failing to abide by its own rules and regulations.

## DEMAND FOR RELIEF

WHEREFORE, the plaintiff prays for:

1. A declaration that federal defendants' acts and omissions as shown in this litigation violate and continue to violate the Fifth Amendment to the U.S. Constitution, and USDA statutes, regulations, and handbooks; and

2. A declaration that federal defendants acted without authority in foreclosing Plaintiff's mortgage and causing Plaintiff's Social Security benefits to be diverted for RD's use, and that USDA and its agencies must make Plaintiff whole under the Section 502 program; and

3. An injunction enforcing those declarations and requiring federal defendants to:

   i. Restructure the mortgage and related paperwork in such manner as to leave Plaintiff substantially whole as if the breach had not occurred;
   ii. work with Plaintiff in finding a qualified contractor with a mandate to enforce the independent inspector's recommendation that RD adds funds, at no cost to Plaintiff, to correct the construction errors and overruns that were in no way caused by Plaintiff;

      iii. Reimburse Plaintiff for funds intercepted from her Social Security benefits, with
           interest from the time of foreclosure;

      iv. Compensatory damages from federal defendants as determined by this court; and

4.       A judgment against defendants Scott and Scott & Sons for funds they received exceeding the funds they were entitled to receive and for damages caused by the results of their intentional and negligent violations of the contract; and

5.       For costs and reasonable attorney fees; and

6.       All other legal and equitable relief as the Court may deem just and proper.

## JURY DEMAND

The Plaintiff demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: September 8, 2022

Respectfully submitted,

Jesse L. Kearney
Cross & Kearney, PLLC
Attorneys at Law
PO Box 6606
Pine Bluff, AR 71611
(870) 536-4056●536-0216 fax
e-mail: cklawoffices@aol.com

By: /s/Julius D. Kearney, Sr.
Julius D. Kearney, Sr.
Kearney Law Offices
PO Box 6606
Pine Bluff, AR 71611
(870) 536-4056●536-0216 fax
e-mail: kearneylawoffices@gmail.com

# AFFIDAVIT

## Helen J. Proctor
### 528 Porter Hill Road
### Lake Village, Arkansas  71653

I, Helen J. Proctor, being first duly affirmed, make the following statement freely and voluntarily to Tonya R. Ahmed who has identified herself as a Program Complaints Investigator for the Office of Assistant Secretary for Civil Rights (OASCR), United Sates Department of Agriculture (USDA), knowing that this statement may be used as evidence.  I further attest that I have been given an opportunity to review my individual statement given to the investigator and it is true and correct.  No threats or promises have been made to me in exchange for my statement.

The assigned investigator has told me the purpose of this affidavit is due to the fact that I, Helen J. Proctor, hereafter Complainant, filed a discrimination complaint on May 25, 2015, and received by OASCR on June 8, 2015, against Rural Development (RD).

The OASCR has determined that the information which you submitted and received by OASCR on June 8, 2015, constitute a complete complaint over which OASCR has jurisdiction.  OASCR determined the issues of the complaint to be:

> Whether Rural Development (RD) officials and Michael Scott, non-license contractor, discriminated against you on the bases of disability (Physical) and age (78) when they allegedly:

1. From December 2008 through April 2, 2015, demanded mortgage payments;

2. From February 5, 2010, through April 2, 2015, RD failed to acknowledge your Representative (Hal Palmer) and Power of Attorney over your affairs. As a result, RD refused to answer any questions and/or cooperate with the Representative; and

3. On August 4, 2015, RD issued you a Notice of Acceleration and Intent to Foreclosure.

Initial:

Exh A

Helen J. Proctor
Affidavit: 15-7185

1) **Please provide a brief background description of your allegations against RD.**

   **Answer:**

   I, Helen Proctor live, in Lake Village, Arkansas. I am elderly and am in need of a good house to live. I am the owner of three acres of land in which I have lived on in a mobile home that is more than 30 years old. I purchased this mobile home new and it has been in the same place since.

   After meeting all requirements, on several occasions, for eligibility to participate in the program, a contract was executed to build my dream home in December of 2008.

   The person that was to build the house and the area rural development group used my age, disability and good credit to get access to US treasury funds.

   The house was not completed. They damaged my current property and left a structure on my place that is not what I agreed to or as stated in the documents submitted to get funding.

   I been threatened, my living conditions have been made worse by these individuals. I cannot get a good home for myself because of the discriminating practices and actions the RD representatives have forced.

   I did everything asked of me and the RD representative along with Michael Scott actively worked to mislead and take advantage of my age and disability. They knew she was not able to get to and from, was desperate to have a good home and was generally at her place alone.

   Instead of helping, listening, following the rules and regulations, or trying to resolve issues, RD representatives threaten to take my land, and foreclosure and other "servicing" actions. They called me always to say how needed to accept what Michael Scott was doing or lose everything I own and then pay them because I had signed a promissory note and closed on the house.

   In all events, the RD management officials I have dealt with since December of 2008 are:

   **Lawrence McCullough**
   **Cheryl Ivy**
   **Larry kindle**
   **Marrisa Harris**
   **And now Mable Gibbs-Fowler**

Helen J. Proctor
Affidavit: 15-7185

I still have a letter from January of 2010 were Larry Kindle repeatedly stated that RD had nothing to do with the deal. All the time RD handled and provided the funds to Michael Scott.

Over the years (2008 to 2016) RD has refused to cooperate or listen. They always behave like they are confused about things. My son, Hal Palmer, on many occasions has attempted to communicate and reason with RD representatives. Even though they might acknowledge Hal as my representative, they rarely wish to followed through with or deal with my son. When they realized my son was really going to follow this situation and stay on top of them, RD scrambled and worked to confuse the issue/s. Even though they started to say he was my representative, RD still never took any real efforts to listen or work to resolve any problems.

RD conversations always lead to paying Michael Scott more money. Any other contractor or my son would be given requirements and obstacles not required of their contractor Michael Scott.

The structure on place does not match the submitted plans used to get funding and is not livable.

RD represented falsified the inspection reports in order to get access to funds and provide them to Michael Scott. They were not protecting the government's interest as they did not care whether the house was being built according to plans or not. Their goal was to take advantage of my age and disabilities to fool me, give Michael Scott $101,500 and have me pay back $101,500.00 loan for a house that was never built.

Please keep this fact (I have documents to prove) in mind. The concrete was poured on April 23, 2009. The first so called inspection was completed a day before the concrete was poured. Also, Michael Scott, the RD approved contractor, abandoned the job on or about June 22' 2009. In addition, Rd representatives continued their attempts to pay Michael Scott after getting knowledge from my son and daughter that their contractor was not actively working to build the house. The August 2009 payment is representative of this fact. In conclusion to this fact, Michael Scott walked away with over $48,000 cash in two months. More US treasury funds would have been given to him my son had not stepped in.

Helen J. Proctor
Affidavit: 15-7185

2) **You alleged from December 2008 through April 2, 2015, demanded mortgage payments. Please provide the following:**

How many Demand for mortgage payments did you receive from RD? What are the date(s) of the Demand Letters? Which RD official sent the Demand letters? What was your response? Did RD answer your response? What happened?

How did RD discriminate against you based on your disability (physical)? How were your harmed by these actions?

How did RD discriminate against you based on your age (78)? How were your harmed by these actions?

Answer:

I received a number of verbal demands in person or via telephone calls. One of the first demands came from Marrisa Harris during or after a so called on August 25th 2009. On January 8, 2009, Larry Kindle sent a letter confirming that threat. Other letters followed with the same or similar threat. Responses to the demands were to consistently let RD know what was actually agreed upon and that I did not approve of how they were working to make it look like I was doing something wrong and being unreasonable. I did not approve of the building or paying Michael Scott for work he had not performed.

They discriminated against me physically because they knew I had limited mobility and at my age they thought I was desperate and did not have enough education to understand how a house could be built right. They claimed I was confused and did not know what I was watching them do.

Larry Kindle presented a very prejudicial attitude when he stated I did not deserve or need the house because I was an old lady and lived on a dirt road. He stereotyped me as being old and lived way out here in the rural so I did not need such a house. Larry Kindle stated "I was being nick picky and didn't need all that".

I have been harmed because now I can get a house for myself. RD has got my land tied to a $101,500 loan. Every time I try to get a better place I am denied this mess is on my record. Since the house was never built and not livable, I have been forced to live in this falling down house and make do with it. I do not have the freedom to go places because I realize I am going to have to climb back up in this old trailer. I have now spent a lot money on this old trailer to keep it from falling down or me from falling through the floor. It is very expensive to keep warm in the winter or cool in the summer. The place does not look appealing to my visitors. It is a shame

Helen J. Proctor
Affidavit: 15-7185

that I don't have a place for anyone to enjoy visiting with me. I am a grandmother
and this place is nowhere close to being fit to have family gatherings.

Helen J. Proctor
Affidavit: 15-7185

3) You alleged from February 5, 2010, through April 2, 2015, RD failed to acknowledge your Representative (Hal Palmer) and Power of Attorney over your affairs. As a result, RD refused to answer any questions and/or cooperate with the Representative. Please provide the following:

   Name the management officials who engaged in the alleged discriminatory actions against you.

   Lawrence McCullough
   Cheryl Ivy
   Larry kindle
   Marrisa Harris
   There was also some guy there saying he was general counsel for RD

   Identify the date, location, and describe what transpired. July 8, 2010, Room 5516, 700 West Capital, Little Rock, Arkansas. On that date Cheryl Ivy, Larry Kindle, and Lawrence McCullough all lied and said they tried to give my money back and that we had signed or changed the plans somehow. They refused to agree that their contract was not licensed and was not following the approved and submitted plans. They done nothing but lie and push back on any kind of progress since then.

   When did you give RD a Notice of Representation and Power of Attorney naming Mr. Palmer? I gave a legal Document on or about February 5, [2010]. Before that, RD development had their own form I had filled out before the contract was executed in December of 2008.
   Why did RD refuse to answer any questions and/or cooperate with your Representative (Mr. Palmer)? I am not sure. They never said specifically. Explain what happened each time Mr. Palmer attempted to advocate on your behalf. Each time they would tell him they could only discuss my concerns it the borrower.

   How did RD discriminate against you based on your disability (physical)? How were your harmed by these actions? By assuming I was stupid. Whenever they came to my place they moved faster than I leaving me behind so I could not participate, they give me time to contact anyone for help, they were always rushing me to sign this and that, when I told them I need a place convenient for me to get around in they said they did not care that the doors were not wide enough, that the tubs and showers needed to be easy for me to get in and out of. They did not care that I need taller toilets or hand rails.

   They acted like they did not know I was here. If I could not get to where they were, then that was my problem.

Helen J. Proctor
Affidavit: 15-7185

**How did RD discriminate against you based on your age (78)?  How were your harmed by these actions?**

**Answer**
Again, they thought I was stupid, did not have an education or ignorant to certain facts.  With my age I was desperate and should go along with anything.  They have prevented me from getting a good place for me to live and left me out here with much less than what I need.  They have made these past seven or so years like a living hell financially, emotionally and physically.   I have to climb around this old trailer and do with less when I can afford a do better for myself.  Every time I try to get a house, this shows up on my credit.  This is my land and all I have but I still cannot do what I want with it because of them.  I am struggling and suffering and just need a good place to live and I am not being allowed to do so.

Page 7 of 16

Helen J. Proctor
Affidavit: 15-7185

4) **On August 4, 2015, RD issued you a Notice of Acceleration and Intent to Foreclosure.**

Name the management officials who engaged in the alleged discriminatory actions against you. Identify the date, location, and described what transpired. Explain the following:

Which RD official signed the Notice and Intent Letter? Did you respond to the letter? Did RD answer your response?

How did RD discriminate against you based on your disability (physical)? How were your harmed by these actions?

How did RD discriminate against you based on your age (78)? How were your harmed by these actions?

Answer:

Which RD official signed the Notice and Intent Letter? Thomas B Herron Did you respond to the letter? Yes. Did RD answer your response? No

How did RD discriminate against you based on your disability (physical)? How were your harmed by these actions? They have prevented me from getting a good home that I really need due to my limited mobility.

How did RD discriminate against you based on your age (78)? How were your harmed by these actions? Again, they thought I was stupid, did not have an education or ignorant to certain facts. They asked me to sign documents about the house being built that were false and would leave me paying for a house I never received. I assume they thought I was old enough and would die before anyone realized what they had done so they would never be held responsible.

Helen J. Proctor
Affidavit: 15-7185

5) **How did you select Michael Scott - Scott & Sons Construction Company as your contractor? Did RD recommend or approve this Contractor? Did you submit the construction plans to RD for review and approval? Did you request any changes to the plans? Explain the following:**

**Was Mr. Scott licensed in the state of Arkansas to conduct construction? Did Mr. Scott submit a valid Builder's Warranty to RD? Did the Contractor complete the construction of your home?**

**Answer:**

**Michael Scott was not selected by me, Helen Proctor. It was the only option provided. It was either him or no house would be built.**

**RD recommended and Approved Michael Scott as well as the Architect Ron Litton**

**Plan number 13551 dated 4/14/2008 was submitted for review and was approved.**

**No changes to the plan were requested.**

**We asked RD and Michael Scott numerous times for information on a Builders Warranty and never received it. In fact, Larry Kindle stated it was neither required nor needed.**

**Explanation. Michael Scott did whatever he wished and RD ensured that he was paid.**

**A home was never completed. The building left on my property is not livable. There is no plumbing for waste disposal, improper and unsafe wires, and no connection for water. The house speaks for itself and the workmanship is poor at best.**

Helen J. Proctor
Affidavit: 15-7185

6) **When did RD conduct inspections on the construction of the home?  Did RD issue any checks to you or the Contractor?  How many?  When were the checks issued and how much was each check?  What happened regarding the checks?  Did RD conduct a final inspection?**

**Answer:**

**There were three 'so called' inspections performed.**

**Inspection # 1 – 4/22/2009**
**Inspection # 2 – 6/11/2009**
**Inspection # 3 – 8/25/2009**

**Altogether there were four checks given to Michael Scott that I know about.**

**12-09-2008 - a required cashier's check for $1,800 (said it was for waste disposal)**

**US Treasury Check dated 5/18/2009 - $10,150**
**US Treasury Check dated 6/22/2009 - $24,476**
**US Treasury Check dated 8/25/2009 - $11,343**

**The checks were cashed and there was neither accounting nor reconciliation of how the funds were being applied.  When I asked RD, I was told that information was not required and that it was up to me to keep up with.**

**According to what I can find out, RD conducted the last inspection on August 25, 2009. As a result RD provided Michael Scott with another US Treasury in the amount of $11,343.00.  I do not know if there was really the 'final' inspection.**

Helen J. Proctor
Affidavit: 15-7185

7) **When did you notify RD that you had discrepancies with Mr. Scott: How many times did you notify RD: Did RD respond to your concerns: Did RD notify the Contractor? Why or Why not? What happened? Please explain.**

**Answer:**
**We first notified RD representatives early in June of 2009. Since then it has been too many times to count but we can verify a number of accounts. RD did not respond in kind. They generally ignored concerns. My concerns seemed to prompt RD to find ways to pay the contractor regardless of what we reported. The number one response was to pay the contractor and create false inspections to get the funds. Larry Kindle was rude and generally dishonest.**

Page 11 of 16

Helen J. Proctor
Affidavit: 15-7185

8) **Are you aware of any other persons (outside of your protected classes – Disability and Age) or entities who you know have had identical or similar experiences regarding the RD Direct Single Family Housing Program and their relationship with Rural Development? If so, please provide the names and contact information (if you do not wish to provide or know the information please state so).**

   **Answer: I do not wish to provide.**

Page 12 of 16

Helen J. Proctor
Affidavit: 15-7185

9) **Do you have any additional information to substantiate your allegations regarding this complaint?**

**Answer: Yes.  I have multiple other documents I can provide during the formal investigation when or if needed such as home inspections and other reviews or reports. Numerous e-mails and communications as well as the actual plans submitted and approved to get funding.**

Page 13 of 16

Helen J. Proctor
Affidavit: 15-7185

**10) What are you seeking to resolve this complaint against RD?**

   **Answer:**


1.)  A house built in the location on the subject proper where I desired for it to be.

2.) The property around the house to be fully and completely landscaped with mature trees and plants as this has been going since year 2009.

 3.)   Resolve/settle/complete all issues with in two months.

4.)   Restore / allow my Freedom to better condition.

5.)   Stop all discrimination tactics and techniques.

4.)   Restore my rights and ability to own my property, to obtain and own a good home.

6.)   Restore my financial independence that has been stripped away and destroyed.

7.)   Remove my name, Helen J. Proctor, name and association from anything negative created by these actions and proceedings. I.E. Credit reports, Loans Documents, Title Documents/ Records, Government agencies, CAIVRS reports, Bank records, and FHA and USDA programs.

8.)   Provide the house that I am entitled. A house that meets my needs currently; a house that meets and exceeds current building standards and code requirements.

9.)   According to the executed contract, I am entitled to $30.00 per day as liquidated damages for each calendar day of delay that the house is not completed from the original completion date of June 15, 2009. As of September 15, 2016, that is a total of 2,649 days (almost 7 years). Thus, I am due at least $79,470.00 in liquidation damages.

9.)   Reimbursed monies I have spent related to this issue and in efforts to resolve, keep my property and maintain my welfare: The below items do NOT fully represent all expenses. Expenses such as property repair, mileage and postal fees and other services cost are not listed.

Helen J. Proctor
Affidavit: 15-7185

| | | |
|---|---|---|
| a. | House Plan | $1,030.00 |
| b. | RD-Septic | $1,800.00 |
| c. | Legal | $5,000.00 |
| d. | Architect Review | $800.00 |
| e. | Insurance | $622.00 |
| f. | Utilities | $1,200.00 |
| g. | Home Repairs | $7,725.00 (water, floor, gas, weather) |
| h. | Home Inspection | $300.00 |
| i. | Survey | $600.00 |

10.) I endured stress (physical and emotional), undeserved hardships, personal health challenges, embarrassment, continued humiliation and mental anguish. In the community, Rural Development has defamed my character.

11.) I, Helen Proctor, am in need of a house that meets all my needs for good health and comfort most immediately.

Helen J. Proctor
Affidavit: 15-7185


**PLEASE PROVIDE SUPPPPORTING DOCUMENTS WHENEVER APPLICABLE!**

I have read the above statement consisting of ___16___ pages.  I further attest that I have been
provided full opportunity to review this statement and given the opportunity to make additions
and corrections.  It is true, complete, and correct.  I have initialed the bottom of each page, to
indicate that I have reviewed the material on each page, and signed the Affidavit below.
I declare under penalty of perjury that the foregoing is true and correct.

_____        Sept. 15, 2016
Helen J. Proctor                                      Date
**Complainant**


_____        Sept. 15 2016
**Hal Palmer**                                          Date
**Representative/Power of Attorney**


Page 16 of 16



**USDA**

**United States Department of Agriculture**

April 9, 2015

Departmental
Management

Office of the
Assistant
Secretary for
Administration

Office of Human
Resources
Management

1400
Independence
Avenue, SW
Washington, DC
20250

**TO:**    Jessica M.E. Taylor
Special Agent-In-Change
Investigations Liaison and Special Operations Division

**FROM:**    *Sheila A. Kopczynski*
Sheila A. Kopczynski
Program Manager, Personnel Misconduct Investigations, OHRM

**SUBJECT:    Hotline Complaint – PS-0499-0501**

This is in response to the email notification for the Subject Hotline Complaint dated August 15, 2012 sent to the Office of Management Services (OMS). On February 12, 2015 the Office of Human Resource Management (OHRM) began the review by making contact with Mr. Hal Palmer, the complainant and designated representative of Ms. Helen Proctor. Based on OHRM's review I am forwarding this to the OIG Southwest Regional Office Investigation and Audit Divisions.  It appears in the initial review that we have a contractor receiving funds from the federal government through a Single Family Housing Loan held by Ms. Proctor and USDA that has not completed the work for which he has been paid and is not responsive to the Rural Development (RD)-Arkansas (AR) staff when requested to explain the deficiencies which make the home uninhabitable (no sewer system, water, electrical non-compliance, failure to follow the architect's plan, the depositing of a payment without Ms. Proctor's signature.) The issues identified in the initial review are potentially a criminal issue and OHRM does not have the authority to investigate.  Additionally, review of the RD-AR office staff's emails and documents provided by Mr. Hal Palmer, lend some concerns related to a potential gap between the handbook requirements and the actual administration of this Single Family Housing Loan approved for Ms. Proctor.  The comments provided by RD- AR staff and Mr. McCullough in the form of emails provided by Mr. Palmer and their responses to the Local Channel 7 news potentially demonstrates a disconnect between the regulations and the method the staff used to monitor construction, handle dwelling construction *complaints, changes made by the contractor during the construction, etc.  Again, OHRM* does not have the resources or background to conduct an audit of the RD-Arkansas Rural Housing Program.

**Allegation:**

The allegation OIG provided in their notice was; *"Complainant, Hal Palmer, telephone number (704) 460-8400, alleges that USDA Rural Development (RD) representatives, have handpicked a contractor to get funds using the Section 502 Home Loan Program. Those funds were handed directly to the contractor by the RD representatives without the knowledge and consent of the elderly applicant. The contractor did not build the house and was provided with the funds. Furthermore, the complainant alleges the RD State Director, Lawrence McCullough, has been made aware of this and stated that he has no intention of "fixing this problem." The complainant says Mr. McCullough wishes to avoid the truth being revealed by stating that the elderly lady or her son terminated the contractor. However, the*

AN EQUAL OPPORTUNITY EMPLOYER

**Exh B**

*rules and regulations for the Section 502 Loan Program were not followed allowing USDA RHS funds to be taken for a purpose other than intended."*

**OHRM's review:**

I have broken down the complainant's concerns and provided a response to each of them.

1. **The contractor was handpicked by RD.** There isn't in the initial review sufficient evidence supporting that the RD staff selected the contractor; however, the contractor was reviewed by the RD-AR staff and approved before Ms. Proctor could enter into a construction agreement with him. The USDA approval process for a contractor to meet the USDA-RD requirements to be eligible to enter into a Single Family Housing Loan is still in question. The information provided shows that the contractor was not licensed in Arkansas before being approved by RD-AR to construct Ms. Proctor's home or prior to the scheduled start date identified in the construction agreement to start the construction. This requirement is known by the RD-AR staff as they referenced it in the November 8, 2011 letter to Ms. Proctor.

2. **The funds were handed directly to the contractor by the RD representatives without the knowledge and consent of the elderly applicant.** There are three (3) copies of checks submitted by Mr. Palmer; two of the checks (5-18-2009 and 6-22-2009) were endorsed by Ms. Proctor and Mr. Scott. The third check dated January 12, 2010 for the amount of $11,343.00, did not have a signature for Ms. Proctor or Mr. Scott but was deposited into Mr. Scott's account. The information I received does not indicate who the Loan Originator identified as receiving the check. Based on the newscast, Ms. Proctor indicated that she did not receive the checks. Mr. Kindle in correspondence with Mr. Palmer stipulates that Ms. Proctor signed all three checks, which the documentation provided by Mr. Palmer does not support this statement.

3. **The contractor did not build the house and was provided the funds.** According to the Construction Contract signed by Ms. Proctor and Mr. Scott on December 9, 2008, Mr. Scott would receive partial payments not to exceed 60% of the loan and would upon completion of the construction *"in accordance with the bid submitted by Scott & Son Construction dated 9/02/08; in accordance with Form 1924-2, Description of Materials; in accordance with plans from Ron Litton dated 04/14/08."* Mr. Scott did receive all three payments plus a separate check of $1800.00 to complete Ms. Proctor's septic system. The structure that is completed does not meet the requirements of Mr. Litton, the architect's plan and does not have a septic system or water system. RD-AR staff is required to complete inspections on the structure prior to the loan originator issuing a check based on the percentages of the home being completed. The RD-AR staff completed these inspections, however, it appears the two inspectors did not note during the inspection the contractor's failure to follow the architect's plan-a requirement in the contract agreement, and provided the approval for release of funds without verifying.

4. **Mr. Lawrence McCullough is aware and has no intention of fixing this problem.** The documents provided by Mr. Palmer do show that Mr. McCullough is aware of the problem. Mr. McCullough sent Ms. Proctor a letter indicating that RD is not a party to the contract between her and Scott and Son's Construction. Any dispute between the parties is resolved between the contracting parties. This statement in the letter dated November 8, 2011 would

AN EQUAL OPPORTUNITY EMPLOYER

lend to Mr. Palmer's perception that Mr. McCullough has no intention of *"fixing this problem"*. Mr. McCullough is correct about the disputes in general terms however, RD-AR according to the Rural Development (RD) Direct Single Family Housing Loans and Grants Field Office Handbook Hb-1-3550 as well as the RD 1924 f does have oversight responsibilities to ensure that money provided through a contract where RD is a party are utilized in accordance with that contract as well as ensuring that inspections completed are thorough and accurate to the specifications provided in the construction agreement.

**5. The rules and regulations of the Section 502 Loan Program were not followed allowing USDA RHS funds to be taken for a purpose other than intended.** There appears in the initial review that this allegation has merit see additional information provided below.

**Additional information identified in the review:**

1. Construction of the dwelling thus far was not in compliance with Mr. Ron Litton's design plan. These are significant structural differences that should be noted by an RD Inspector when conducting an onsite inspection to determine completion for payment. These items are found in independent inspector's assessments and were provided to Mr. Scott by RD-AR in the letter dated October 7, 2010. Mr. Palmer has shared all the documentation regarding the inspections with the RD-AR staff.

2. January 12, 2012, Larry Kindle, Area Director sent a letter to Ms. Proctor. Included in this narrative is this statement, *"List of Payments to contractor: The construction amount was $99, 500.00. The amount disbursed to Scott & Son Construction, $45,969.00. This is a breakdown of disbursements, $10, 150 (5-18-09), $24, 476.00 (6-22-09), and $11, 343 (8-28-09). The balance remaining in your account is $53, 531.00. All disbursements were authorized and signed by you."* Mr. Palmer provided all three of the checks to me and the third disbursement check was not signed by Ms. Proctor or her representative.

3. The Direct Single Family Housing Loans and Grants Field Office Handbook Hb-1-3550 stipulates under Section D, *"Changes During Construction"*, *"If changes to the approved drawings and specifications are required during construction, the applicant and contractor must sign Form RD 1924-7, Contract Change Order. All modifications must be certified on Form RD 1924-25, Plan Certification, if the modification is regulated by the applicable development standard. Before signing it, however, the Loan Approval Official must review and sign the change order to ensure that the change fits within the approved loan amount."* The only change order referenced by Mr. Kindle is the start date of the construction. The contractor did not notify RD-AR or Ms. Proctor of the changes made to the architectural plan. Ms. Proctor began sharing changes with the staff on June 12, 2009, which is acknowledged by Mr. Kindle in an email to Mr. Palmer on July 28, 2009 when Mr. Palmer raised concerns again with the lack of the construction progress or compliance. Items the contractor chose to change without following the RD requirements were noted by Ron Litton, the architect, in a letter dated June 16, 2010. Some of these items would be addressed in RD's inspections and which Mr. Kindle deemed in compliance based on the Agency last inspection completed on *June 11, 2009 (email from Mr. Kindle to Mr. Palmer on 7-28-09)*. These changes are structural and not merely aesthetic. Mr. Palmer has also provided pictures with comments to highlight the changes as well as a list he shared with RD-AR staff titled "conditions" that Mr. Kindle forwarded to Mr. Scott in his letter dated October 7, 2009.

AN EQUAL OPPORTUNITY EMPLOYER

4. Jason Pederson KATV Channel 7 news requested information from the RD-AR office, Ms. Karen Petrus, the State Administrative Officer and not the Rural Housing Program Director responded. Ms. Petrus' response to question 2 about Michael Scott obtaining an Arkansas residential building contractor's license prior to commencement of construction on Ms. Proctor's house is true however, Mr. Scott's residential construction license was activated by the State of Arkansas on March 18, 2009 he was scheduled to begin construction on January 15, 2009 at this time USDA had already approved him as a contractor for Ms. Proctor without him having the appropriate licenses to begin construction.

5. Rural Development (RD) Direct Single Family Housing Loans and Grants Field Office Handbook Hb-1-3550 indicates that the RD-AR staff would have performed a Single Housing Site Checklist prior to approving a loan for Ms. Proctor to build a new home. The checklist contains a section regarding water and sewer and asks, *"If the sanitary sewers and waste water disposal systems are non-municipal, has an acceptable "system" been approved by appropriate authorities and agencies?( ) Yes ( ) No"* This initial site visit checklist was not available during this initial review. The significance of this specific question is that after construction had begun it was determined that Ms. Proctor and/or the contractor had not provided a Percolation test with the approved system yet RD-AR issued a check to Ms. Proctor after the loan was approved to give to Mr. Scott to put in her sewer system for the new home. Mr. McCullough's email to Mr. Donald Campbell III dated August 27, 2010 stipulates that this test was not provided and normally a loan is not approved until it is provided. Mr. McCullough's email indicates that, *"the family apparently wasn't advised to submit the results of the percolation test prior to their getting contractor's bids and architect's plans and specifications. The septic system was omitted from the architect's dwelling specifications."* Mr. Campbell responded to Mr. McCullough that potentially the land on which the house has been constructed may need *"a large field to properly "perc" (as a lot of the land is down there) the waste, then we may have a bigger problem than we thought."* To date Ms. Proctor's home is not connected to sewer or water systems and the contractor has not returned the $1800.00 dollars.

6. Mr. Kindle sent a letter to Mr. Scott on October 7, 2009 indicating that Mr. Hal Palmer representing Ms. Helen Proctor had attached conditions regarding the construction of the dwelling and asked Mr. Scott to respond within seven (7) days from the date of the letter. Mr. Scott responded on October 27, 2009 and indicated, *"In regards to the construction of the dwelling for Helen Proctor, Scott & Son Construction will finish her house as the family and we agreed to at the original signing of the contract. Scott & Son will refund Mrs. Proctor on septic system and pay her a reasonable amount of electric used during the building of her home. Scott & Son would like to request a meeting with family and all USDA involved, Larry Kindle and Marisa Harris before construction is resumed."* Mr. Palmer shared with me that to date over five (5) years later, no meeting has occurred due to RD-AR not accommodating the requests and that the home is unfinished, *"sitting open and exposed to the elements".*

In summation, several factors seem to be contributing to Ms. Proctor's situation and this review does not contain a complete portrayal of all the parties' actions or responsibilities, however, there seems to be enough examples to invoke concern that Ms. Proctor and the agency's interests are not being addressed. This office does not have the resources or expertise to audit RD-AR Rural Housing Loan program or to investigate Scott & Son Construction. I have forwarded everything I have received from Mr. Palmer to assist OIG Investigations and Audit with their review.

In light of the significant elements of this case being outside of OHRM's authority I am administratively closing this case. If you have any questions or concerns, please contact me at 208-413-7043 or at Sheila.kopczynski@dm.usda.gov.

cc:
Bryan Knowles, ELRD Director-OHRM
SAC Mary L. Lewis, OIG SW Region-Investigations
*RIG Dennis J. Gannon, OIG SW Region-Audit*
Hal Palmer, Complainant and Helen Proctor's Representative

AN EQUAL OPPORTUNITY EMPLOYER

**BUILDING DESIGNER, P.A.**

CPBD,AIBD

P. O. Box 720296
Byram, MS 39272
601-373-8203
601-373-8204

*EXHIBIT 8.a*

June 16, 2010

Mr. Hal Palmer
Palmer.hal@gmail.com

Dear Mr. Palmer:

Re:    Home for Helen Proctor
       528-A Porter Hill Road
       Lake Village, AR
       Plan No. 13551

Per your request, I inspected your mother's unfinished home at 518-A Porter St. in Lake Village,
Arkansas, on June 10, 2010, for the sole purpose of seeing that the home was built according to
the house plan.

Let me state that I am not a certified building inspector. I am a Certified Professional Building
Designer with the American Institute of Building Design.

Upon arrival at approximately 11:00 a.m., I was met by your very kind brother and sister.

Before I proceed with my report, please keep in mind there is no easy way to determine the
integrity of a foundation that has already been poured. Also, with sheetrock in place, I could not
see the framing, plumbing or electrical.

I began my inspection with measuring the location of the walls in relation to what is shown on
the plan prepared by me. I found the following:

    (1)    Bedroom No. 3 wall was framed at 12'-10" not 10'-l0" as shown. Please Note:
             Locating this wall in this location does make the garage smaller and too small to
             Use this wall for garage storage.

    (2)    The garage walls were not placed. These walls were omitted creating a carport.
             The plan shows a garage.

    (3)    The plan shows a 36" door entering Bedroom 3. This door is roughed-in for a
             32" door.

-2-

Exh C

    (4)    The plan shows 2 single doors at each closet in Bedrooms 2 and 3.  The home
        Was roughed-in for a 4'-0" wide double door, each closet.
    (5)    The "B" window at Bath 2 was smaller than the 2'x4' window shown on plan.

**EXHIBIT.Bb**

In addition to dimensional issues, I noted the following:
    (1)    No vault at Family Room, as shown on plans.
    (2)    No pass thru at Kitchen
    (3)    No brick ledge for brick except at front wall.
    (4)    The house had vinyl siding instead of brick.

HVAC issues, as follows:
    (1)    Only one register in Dining area, the plans show two.
    (2)    No vents installed at Owner's Retreat.
    (3)    No vent in Utility.
Please note:
    (1)    Flex duct is acceptable as long as it meets the insulation value stated on the plan.
    (2)    Each connection should be snap tied and taped for a proper seal.
    (3)    No seer rating was shown on HVAC system, that I could see.

Electrical issues, as follows:
    (1)    There were no plugs installed on the interior wall at Bedroom side of walk-in
        Closet wall in Owner's Retreat.
    (2)    Water heater is electric, therefore, no venting required.

Plumbing issues, as follows:
    (1)    Toilet not centered in Owner's Retreat (+/- 7" off center)

Please bear in mind that some tasks not done at this stage of completion are not unusual:
    (1)    Ceiling insulation is normally installed after all work has been completed in the
        Attic.
    (2)    Septic system can be installed towards the end of construction.
    (3)    Venting of cook tops, etc. can be done before insulation but near the end of
        Construction.

While at the home,  I was told previous inspections had listed the painting, trim work and
cabinets as complete.  These tasks were not complete.  I mention this only as a record of what I
saw while at the home.  I have no knowledge of the previous reports.

I have no knowledge of the amount of the construction contract or how much money has been
advanced to the contractor to date.

-3-

EXHiBiT Bc

I did note some positive things, as follows:

    (1)    Trusses were used and 1"x4" striping was installed. This probably is the reason
            You have flat ceilings with no cracks. Normally if new construction sits for a
            Long time, there is potential for joints to separate if 1"x4" striping is not installed.
            Trusses are more structurally sound, in my opinion, than stick framing. However,
            Your vault would have to be built into your trusses. Hence, no vault.

    (2)    Your foundation had a couple of normal curing cracks. The slab was level when
                checked with my instrument. However, as previously stated, there was no
brick
            ledge for brick.

This is an unfortunate situation if, in fact, the contractor has been possibly overpaid for work not
completed up to this point. Some of these things can be corrected. However, it would be
difficult to get brick on the home, build a vault in the Family Room and form a Garage wall
section to establish a garage instead of a carport.

I hope this information is helpful to you. While at the home, I noticed someone had been
attentive to the detailing and made notations and taping in areas that should have been different.
It is unfortunate that the contractor did not do this task to this stage of construction.

If I can be of any further assistance in this matter, please do not hesitate to contact me.

Sincerely,


Ron Litton
CPBD, AIBD

*EXHIBIT. 8.b*   *S+%*

 

## State of Arkansas

# ARKANSAS STATE POLICE
1 State Police Plaza Drive · Little Rock, Arkansas 72209-4822 · www.asp.arkansas.gov

*"SERVING WITH PRIDE AND DISTINCTION SINCE 1935"*

Mike Beebe
*Governor*

Winford E. Phillips
*Director*

ARKANSAS
STATE POLICE
COMMISSION

Dr. Lewis Shepherd
Chairman
*Arkadelphia*

John Allison
Vice-Chairman
*Clancy*

Steve G. Smith
Secretary
*Little Rock*

Jane Christenson
*Harrison*

Daniel "Woody" Futrell
*Nashville*

Wallace Fowler
*Jonesboro*

Frank Guinn, Jr.
*Paragould*

August 12, 2010

USDA Rural Development
700 West Capitol Avenue
Room 3416
Little Rock, Arkansas  72201
Attn:  Mr. Lawrence McCullough
       Ms. Sheryl Ivy

Re:  Helen Proctor House
     523A Porter Hill Road
     Lake Village, Arkansas

Dear Sirs;

On Friday, August 6, 2010, I traveled to Lake Village to make a walk through inspection of the above referenced property. The following building code deficiencies were noted. The Arkansas Fire Prevention Code, Volume III, R806.3 requires a minimum one inch clearance between the roof sheathing and the insulation where eve or cornice vents have been installed. AFPC, Vol. III, R313 requires smoke alarms in all sleeping rooms, outside each sleeping area in the vicinity of bedrooms, and where more than one is required that they be interconnected. (The Arkansas Mechanical Code, 603.10 requires that all ducts be properly supported. The Mechanical Code is the purview of the Arkansas Health Department. The Arkansas Energy Code requires a minimum R-value insulation in the attic depending on various factors. The Arkansas Energy Code is the purview of Arkansas Economic Development Commission.)

Thank you for your commitment to public health and safety. This office is always available to address your code questions and concerns. Please call anytime.

Sincerely,

Andy Branton
Staff Architect
State Fire Marshal's Office
(501) 618-8367
andy.branton@asp.arkansas.gov

cc:   Mr. Hal Palmer

RECEIVED 2010 AUG 16 PM 4:29 STATE DIRECTOR

RECEIVED 2010 AUG 17 AM 9:13 RURAL HOUSING

*6/*

Exh D

**ARKANSAS DEPARTMENT OF HEALTH & HUMAN SERVICES**
**PLUMBING AND NATURAL GAS INSPECTION / CITATION REPORT**

| | | |
|---|---|---|
| **Report  11-19-09-2** | **Date  11-19-2009** | **County: Chicot** |
| **Plumber/Gas fitter/Other:    Ralph Carbage** | | Lic#  MP 5792 |
| **Contractor Name and Address:** | Dermott Plumbing<br>1074 Lephiew Rd.<br>Dermott, Ar. 71638 | **Phone # 870-510-1571** |
| **Owner and Location of Project:** | Hal Palmer<br>528 Porter Hill Rd.<br>Lake Village, Ar. 71653 | **Ph. # 704-724-8391** |

| Type of Inspection | Rough-In<br>Complaint | Top-Out<br>Investigation | Final<br>Re-Inspection |
|---|---|---|---|

Public Building
Private Building
Requested Inspection
New Const.
Remodel
License Violation
Code Violation
Water Service
Water System
Building Sewer
Building Drains
DWV Venting
Hangers
Workmanship
Fixtures
Special Wastes
Traps
Materials
Combustion                    ___
N. Gas Service Pipe      ___
N. Gas System
Gas Test Pressure
Water Test Pressure      ___
Air Test Pressure

APPROVED
DIS-APPROVED

---

The plumbing and/or natural gas system in the above project contains Violations of the AR. Plumbing Code. You are directed to change the Violations within___30__days. Failure to change the violations will Result in charges against your licenses, or other legal action.

**(COMMENTS LISTED BELOW)**

Respondent failed to request an inspection from the proper Administrative Authority.  ASPC 104.3 & 107.1

Respondent covered plumbing work prior to obtaining the required inspection.  ASPC 107.1.

Respondent failed to provide a job site sign. ASPC 107.1.2.4

Respondent failed to properly test the drain, waste and vent system.  ASPC 312

Respondent failed to provide strike plate protection where required.  ASPC 305.8.

Respondent failed to use a colored primer when installing PVC plastic piping.  ASPC 705.14.2.

Respondent failed to provide a main vent for the drainage system.  ASPC 903.1

---

STATE INSPECTOR:  **Stan Massanelli**                    Lic. # lA02111

Exh5



EXHIBIT 8-1

# SUMMARY LETTER

**HVAC/R CONTRACTOR: Tim Chapman**
**HOME OWNER: Helen Proctor**
**ADDRESS: 528 Porter Hill Rd., Lake Village, AR 71653**

| <u>DATE</u> | <u>ACTION</u> |
|---|---|
| 11-23-09 | Returned to work from vacation & received messages. I had one from (704)724-8319 Al Palmer. I called the number & no answer. I left a message & call back number. I also spoke with the plumbing inspector, and found he had made a visit to site the week before. We agreed to go back on 11-24-09, so I could look at the heating & air. |
| 11-24-09 | We met in Lake Village around 9:00am and went to location. I done a walk through on the job. I found minor violations with the HVAC system. The job was not complete so I did not write a report on anything. Our division will try to contact the HVAC Contractor & discuss the problems first, to find out when and how they plan to correct them. The HVAC Contractor told me when I got in touch with him, he had not been paid for the work done & was told not to go back. He felt like he had been fired. He is willing to correct the problems, if he can get paid for what has been done, & can go back to finish the job. Until the job is complete or the contractor refuses to go back I cannot write a citation for the job. I tried to call Mr. Palmer several times after seeing the job & speaking to the HVAC contractor, with no answer or return calls from him. |

**ARKANSAS MECHANICAL INSPECTOR**
**Phone: (870)853-5525 Fax: (870)853-4433**
**Doug Pearson**

Exh F

**HAL PALMER II**

| | |
|---|---|
| **From:** | Donald K. Campbell, III [don@aoclegal.com] |
| **Sent:** | Friday, August 27, 2010 11:16 AM |
| **To:** | 'McCullough, Lawrence - Little Rock, AR' |
| **Cc:** | 'Ivy, Cheryl - Little Rock, AR'; 'Kindle, Larry - Monticello, AR'; 'Vanlandingham, Mike – Little Rock, AR'; 'Harris, Marisa – Pine Bluff, AR'; anneorsi@aoclegal.com |
| **Subject:** | RE: Helen Proctor's Percolation Test |

## EXHIBIT 6·B

Mr. McCullough:

I will get with the Proctor family and get the percolation test that arranged as soon as possible. Obviously, if the percolation test comes back showing that there is not enough land to put in a septic system, then we have a real problem as it does not matter if the house was perfect if they cannot tie into the water system and cannot have a operating waste disposal system in place. I hope this is not a problem, but if the soil needs a large field to properly "perc" (as a lot of land is down there) the waste, then we may have a bigger problem than we thought. I hope this is nothing or can be resolved easily.

As a precaution that a "perc test" had not been performed, yesterday I talked to someone in Southern Arkansas about getting a "perc test" done. We should be able to get that person hired soon. As soon as I get the results in writing, I will send you a copy of the report and we will see where we are at that point.

Don

Donald K. Campbell, III
Almand, Orsi & Campbell, PLLC
211 Natural Resources Drive
Little Rock, AR 72205-1575
(501) 219-8500 (voice)
(501) 219-8585 (fax)
don@aoclegal.com

---

**From:** McCullough, Lawrence - Little Rock, AR [mailto:Lawrence.McCullough@ar.usda.gov]
**Sent:** Friday, August 27, 2010 9:59 AM
**To:** Donald K. Campbell, III
**Cc:** Ivy, Cheryl - Little Rock, AR; Kindle, Larry - Monticello, AR; Vanlandingham, Mike – Little Rock, AR; Harris, Marisa - Pine Bluff, AR
**Subject:** FW: Helen Proctor's Percolation Test

From the correspondence included it is apparent we do not have a percolation test. Under normal circumstances the homeowner/contractor obtains the percolation test with approved system design prior to approval of the Rural Development Loan. In this case the family apparently wasn't advised to submit the results of the percolation test prior to their getting contractor's bids and architect's plans and specifications. The septic system was omitted from the

c/2

Exh G

*16*

architect's dwelling specifications. The contractor was advised and subsequently requested the additional $1800. We agree the percolation test should have been completed and approved by the State Health Department in advance of this loan's approval. A percolation test is urgently needed. Thanks.

**From:** Kindle, Larry - Monticello, AR
**Sent:** Friday, August 27, 2010 9:07 AM
**To:** McCullough, Lawrence - Little Rock, AR
**Cc:** Ivy, Cheryl - Little Rock, AR; Vanlandingham, Mike - Little Rock, AR; Harris, Marisa - Pine Bluff, AR
**Subject:** RE: Helen Proctor's Percolation Test

The dwelling isn't complete.  Therefore, once the percolation test is completed and the system is installed we will be in compliance with Arkansas Law.  We require the homeowner to provide our office a copy of the percolation test and approved system design for our file.

*EXHiBiT 6B*

*Larry D. Kindle*
**Area Director**
**Monticello Area Office**
**870-367-8400  Ext.5**
**870-367-9186**
**larry.kindle@ar.usda.gov**

**From:** McCullough, Lawrence - Little Rock, AR
**Sent:** Friday, August 27, 2010 8:59 AM
**To:** Kindle, Larry - Monticello, AR
**Cc:** Ivy, Cheryl - Little Rock, AR; Vanlandingham, Mike - Little Rock, AR; Harris, Marisa - Pine Bluff, AR
**Subject:** RE: Helen Proctor's Percolation Test

Aren't we required to insure compliance with State Health Dept. requirements relative to installing a septic system? Shouldn't we have the results of the perc test along with approved system design as a part of our office file. Was this ever required?

**From:** Kindle, Larry - Monticello, AR
**Sent:** Friday, August 27, 2010 8:26 AM
**To:** McCullough, Lawrence - Little Rock, AR
**Cc:** Ivy, Cheryl - Little Rock, AR; Vanlandingham, Mike - Little Rock, AR; Harris, Marisa - Pine Bluff, AR
**Subject:** Helen Proctor's Percolation Test

We don't have a copy of the percolation test or any additional information related to septic system.

*Larry D. Kindle*
**Area Director**
**Monticello Area Office**
**870-367-8400  Ext.5**
**870-367-9186**
**larry.kindle@ar.usda.gov**

-----Original Message-----
From: McCullough, Lawrence - Little Rock, AR
Sent: Friday, August 27, 2010 7:25 AM
To: Ivy, Cheryl - Little Rock, AR; Kindle, Larry - Monticello, AR
Cc: Vanlandingham, Mike - Little Rock, AR; Harris, Marisa - Pine Bluff, AR
Subject: FW: USDA Rural Development-LP Housing and Community Assistance

Please provide response. Thanks.

*EXHIBIT 48*

-----Original Message-----
From: Donald K. Campbell, III [mailto:don@aoclegal.com]
Sent: Thursday, August 26, 2010 5:38 PM
To: McCullough, Lawrence - Little Rock, AR
Cc: 'Anne Orsi'
Subject: RE: USDA Rural Development-LP Housing and Community Assistance

Mr. McCullough:

I have looked throughout our paper work and do not see a percolation test on
the soil for Ms. Proctor's property nor a report on the size of the field
needed to install a septic system for her house.  Do you have a copy of any
percolation test results and report on the field size needed to put in a
septic system in your records?  If so, could you send a copy of it to me.
If not, I am going to have to order one.

Don

Donald K. Campbell, III
Almand, Orsi & Campbell, PLLC
211 Natural Resources Drive
Little Rock, AR 72205-1575
(501) 219-8500 (voice)
(501) 219-8585 (fax)
don@aoclegal.com


This office attempts to keep its system virus free. However, we cannot, and
do not, guarantee any file or attachment sent by this office is virus free.
We strongly recommend any attachment be scanned with an updated virus
protection program before you download anything attached to this
transmission.
================================================================
THIS EMAIL IS COVERED BY THE ELECTRONIC COMMUNICATIONS PRIVACY ACT, 16
U.S.C. §§ 2510-2521, AND IS LEGALLY PRIVILEGED.  THE DOCUMENTATION
TRANSMITTED HEREWITH AND THE INFORMATION HEREIN CONTAINED IS INTENDED ONLY
FOR THE USE OF THE ADDRESSEE AND ARE CONFIDENTIAL UNDER THE ATTORNEY-CLIENT
PRIVILEGE OR OTHERWISE NOT SUBJECT TO DISCLOSURE. IF YOU ARE NOT THE
INTENDED RECIPIENT OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING THIS
TRANSMITTAL TO THE INTENDED RECIPIENT, ANY USE OF SAID DOCUMENTATION AND/OR
INFORMATION OR DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION,
IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR,
PLEASE NOTIFY US IMMEDIATELY BY REPLY E-MAIL OR CALLING (501) 219-8500 FOR
MORE INFORMATION.  PROMPTLY DELETE AND DESTROY THIS DOCUMENT AND ANY
ATTACHMENTS THERETO. THANK YOU.
================================================================

EXHIBIT 6C

-----Original Message-----
From: McCullough, Lawrence - Little Rock, AR
[mailto:Lawrence.McCullough@ar.usda.gov]
Sent: Wednesday, August 18, 2010 11:26 AM
To: Donald K. Campbell, III
Cc: Ivy, Cheryl - Little Rock, AR; Kindle, Larry - Monticello, AR
Subject: USDA Rural Development-LP Housing and Community Assistance

http://www.rurdev.usda.gov/LP_Subject_HousingAndCommunityAssistance.html

We are a part of USDA, not HUD. Rural Development is our mission. We are
made up of three agencies: Rural Housing Service (RHS), Rural Utility
Services (RUS), and Rural Business and Cooperative Development (RBCD). The
above web site should be helpful as it addresses the housing programs. If
there are specific question we can reference specific instruction.

We are assured of your effort to find a contractor. It is important to
remember to maintain insurance on the incomplete structure. Thanks for
keeping us informed.

4
45

03-18-'09 12:00 FROM-AR Board Contractors    501-372-2247    T-607 P002/002 F-989

**License No.**  0071250409    **ACTIVATED**

*State of Arkansas*

# Contractors Licensing Board

SCOTT & SONS CONSTRUCTION CO.
136 PNDEROSA LANE
MONTICELLO, AR 71655

**This is to Certify That**                    SCOTT & SONS CONSTRUCTION CO.

is duly licensed under the provisions of Act 150 of the 1965 Acts as amended
and is entitled to practice Contracting in the State of Arkansas within the
following classification:

LIGHT BUILDING

RESIDENTIAL BUILDER

with the following suggested bid limit _____ $500,000

from _____ November 21, 2008 _____ until _____ April 30, 2009

activated _____ March 18, 2009

when this Certificate expires.

*Witness our hands of the Board, dated at North Little Rock, Arkansas:*

CHAIRMAN

SECRETARY
March 18, 2009

Exh H

FORM APPROVED
OMB NO. 0575-0042

Form RD 1924-7
(Rev. 2-97)

UNITED STATES DEPARTMENT OF AGRICULTURE
RURAL DEVELOPMENT AND
FARM SERVICE AGENCY

**CONTRACT CHANGE ORDER**

| ORDER NO. |
| --- |
| DATE<br>03-20-2009 |
| STATE  ARKANSAS |
| COUNTY  CHICOT |

CONTRACT FOR

HELEN PROCTOR

OWNER

To  MICHAEL SCOTT (SCOTT AND SONS CONSTRUCTION
*(Contractor)*
You are hereby requested to comply with the following changes from the contract plans and specifications:

| Description of Changes<br>(Supplemental Plans and Specifications Attached) | DECREASE<br>in Contract Price | INCREASE<br>in Contract Price |
| --- | --- | --- |
| CONTRACT START DATE (03/23/2009) | $        0.00 | $        0.00 |
| CONTRACT END DATE    (08/23/2009) |         0.00 |         0.00 |
| TOTALS | $        0.00 |         0.00 |
| NET CHANGE IN CONTRACT PRICE | $        0.00 |         0.00 |

JUSTIFICATION:

The amount of the Contract will be (~~Decreased~~)(Increased) By The Sum Of:  ZERO DOLLARS AND ZERO CENTS

Dollars ($        0.00 ).

The Contract Total Including this and previous Change Orders Will Be:  NINETY NINE THOUSAND FIVE

HUNDRED DOLLARS AND 00/100          Dollars ($    99,500.00 ).

The Contract Period Provided for Completion Will Be (Increased) (Decreased) (Unchanged) :  68          Days.

This document will become a supplement to the contract and all provisions will apply hereto.

Requested  *HELEN PROCTOR*                          03-23-2009
                          *(Owner)*                          *(Date)*

Recommended
                          *(Owner's Architect/Engineer)*          *(Date)*

Accepted  *MICHAEL SCOTT*
                          *(Contractor)*                          *(Date)*

Approved by Agency  *Marisa L. Harris*          03-23-2009
          MARISA L. HARRIS, AREA SPECIALIST *(Name and Title)*          *(Date)*

According to the Paperwork Reduction Act of 1995, an agency may not conduct or sponsor, and a person is not required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0575-01042. The time required to complete this information collection is estimated to average 15 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.

☑ ORIGINAL-BORROWER'S CASE FOLDER
☑ COPY-CONTRACTOR
☑ COPY-BORROWER          *POSITION 6*          Form RD 1924-7 (Rev. 2-97)

Exh 1

ATTACHMENT TO USDA-FmHA FORM 1924-16
RECORD OF PRE-CONSTRUCTION CONFERENCE:

TODAY'S DATE: 12/9/08

CONTRACT BETWEEN Helen J. Proctor AND Scott + Son Construction
                   (OWNER)             (CONTRACTOR)

ALL APPLICABLE FORMS WERE DISCUSSED AND SIGNED, INCLUDING 1924-6, AD 1048, 1924-16, 1924-10, CERTIFICATIONS, PEST CONTROL.

CONTRACTOR AND BORROWER BOTH HAVE COPIES OF THE BID ESTIMATE, CONTRACT, AND ALL OTHER APPLICABLE FORMS THAT WERE SIGNED.

GAVE CONTRACTOR TWO EEO POSTERS AND EXPLAINED THAT THESE MUST BE DISPLAYED. ALSO EXPLAINED THAT THE CONTRACT IS BETWEEN THE OWNERS AND CONTRACTOR.  AS OF THE DATE OF THIS CONTRACT, THE OWNER IS HIRING THE CONTRACTOR TO WORK FOR THEM. ALSO EXPLAINED THAT WE MUST ADHERE TO THE BID ESTIMATE AND ITEMS OF DEVELOPMENT AS THEY APPEAR ON THE BID SHEET.  THERE IS NO MORE MONEY!!!  ALSO ADVISED CONTRACTOR THAT HE MUST CALL 2-3 DAYS IN ADVANCE FOR ANY INSPECTIONS. THERE ARE FOUR(4) REQUIRED INSPECTIONS (FOOTING, SLAB, FRAMING, AND FINAL INSPECTION.) IF THERE ARE ANY CHANGES DURING THE COURSE OF THE WORK, APPROVAL MUST BE GIVEN BY OUR OFFICE.  IF A PARTIAL DRAW IS NEEDED, MUST ADHERE TO CONSTRUCTION CONTRACTS.

ALL DATES ARE IN CONTRACT, WHICH IS SIGNED AND IN POSITION 6.  GAVE CONTRACTOR 1924-10, AND DISCUSSED ALL CERTIFICATIONS, RELEASE OF CLAIMANTS, BUILDERS WARRANTY, AND ALL RESPONSIBILITIES OF THE CONTRACTOR.  HE IS RESPONSIBLE FOR ALL BILLS WITH THIS JOB AND ALL SUB-CONTRACTORS. EXPLAINED ABOUT CHANGE ORDER, IF EXTENSION IS NEEDED, ETC.

ALSO:  DISCUSSED WITH CONTRACTOR THAT HE SHOULD CONSIDER HAVING BUILDER'S RISK INSURANCE IN PLACE ON ALL 502 AND 504 CONSTRUCTION AND REPAIR JOBS TO COVER THEFT, STORM DAMAGE, OR FIRE.

OWNER AND CONTRACTOR WILL SIGN AND DATE THIS FORM STATING THAT THIS CONFERENCE WAS HELD.  THEY WILL BOTH RECEIVE A COPY.

CONTRACTOR MUST ALSO COMPLETE APPLICABLE ITEMS ON 1924-2, DESCRIPTION OF MATERIALS, SIGN, DATE & RETURN TO OUR OFFICE PRIOR TO FINAL INSPECTION.  2 DRAWS CAN BE MADE PRIOR TO FINAL, BUT WILL NOT EXCEED 60% OF BID AMOUNT.  40% WILL BE HELD UNTIL FINAL DRAW.

_Helen J. Proctor_ 12-9-08
    OWNER(S)              DATE

_Michael E. Scott_ 12-09-08
    CONTRACTOR(S)       DATE

_Marisa L. Harris_
    USDA-RURAL DEVELOPMENT    DATE

Also requested that contractor bring copy of current Contractors license to appointment. Contractor did not bring to appt. Explained that we would need current license before he starts construction.

Exh J

Account # 36197669

**ADDITIONAL ITEMS OR CONDITIONS: REQUIRED BY CLOSING :** All items checked below apply:

☐ Evidence of completion of Homeowner Education is required prior to loan closing.

☑ Signed sales contract - required.

☑ Plat of survey, acceptable to RHS, showing the improvements to be properly within the lot lines and no encroachments on other properties - required.

☐ The attached list of repairs is to be completed prior to settlement or an escrow in the amount of $ _____ 0.00 will be held until the work is satisfactorily completed.

☐ We will fully disburse the loan proceeds upon completion of the building, subject to a satisfactory compliance inspection report by licensed appraiser and a certificate of occupancy from the governing municipality.

☑ A contractor's statement and supporting waiver of liens are to be provided.

☑ A termite and pest certification.

☐ Flood insurance is mandatory.

☑ Written evidence the following systems are functioning properly and meet all Rural Development requirements must be submitted to Rural Development before loan closing or to the closing agent/attorney at loan closing.

   ✔ Water System.      ✔ Waste Disposal      ✔ Electrical System

   ✔ Heating System.    ✔ Plumbing System

☑ Fire and extended Coverage Insurance: At the time of settlement we will require an original insurance policy containing fire and extended coverage insurance in an amount at least equal to that of the mortgage through a company acceptable to RHS, and a receipt showing premiums paid in advance for one year. The insurance policy shall also contain a standard mortgage clause in favor of the United States of America acting through the Rural Housing Service, or successor agency, United States Department of Agriculture. The address should be: USDA, Rural Development, Centralized Servicing Center, Attn: Insurance Department, PO. Box 66876, St. Louis, Missouri 63166.

☑ Tax and Insurance Payments: Monthly deposits, and initial deposits as determined by Lender, are required to cover the payment of estimated annual real estate taxes, special assessments and hazard, flood, and other insurance if applicable.

☐ Special Assessments: All special assessment installments due prior to closing, must be paid in full prior to, or at time of settlement.

☑ Documentation: The mortgage or deed of trust, note and other pertinent loan documents will be provided by RHS and must be signed by all applicants that are to be contractually liable under this obligation. Further, the mortgage or deed of trust, must also be signed by any non-applicant spouses if their signature is required under state law to create a valid lien, pass clear title, or waive inchoate rights to property. Note: Samples of loan documents are available upon request.

☑ Other
   This is a 502 loan in the amount of $101,500.00 to construct a dwelling.

**COMMITMENT ISSUED BY:**

Loan Approval Official: _Larry Kindle_          Date: 10-21-2008
                        Larry Kindle

Note: Date of loan approval will be the same as date of obligation.

This loan is approved subject to the availability of funds and other conditions required by RHS. If you have any questions, contact the loan approval officer whose name appears above at (870) 534-3200

Exh K

 Gmail

Hal Palmer <palmer.hal@gmail.com>

**RE: Helen Proctor's Percolation Test**
1 message

**Donald K. Campbell, III** <don@aoclegal.com>                                    Fri, Aug 27, 2010 at 11:15 AM
To: "McCullough, Lawrence - Little Rock, AR" <Lawrence.McCullough@ar.usda.gov>
Cc: "Ivy, Cheryl - Little Rock, AR" <Cheryl.Ivy@ar.usda.gov>, "Kindle, Larry - Monticello, AR" <Larry.Kindle@ar.usda.gov>,
"Vanlandingham, Mike - Little Rock, AR" <Mike.VanLandingham@ar.usda.gov>, "Harris, Marisa - Pine Bluff, AR"
<Marisa.Harris@ar.usda.gov>, anneorsi@aoclegal.com

Mr. McCullough:

I will get with the Proctor family and get the percolation test that arranged as soon as possible.
Obviously, if the percolation test comes back showing that there is not enough land to put in a septic
system, then we have a real problem as it does not matter if the house was perfect if they cannot tie into
the water system and cannot have a operating waste disposal system in place. I hope this is not a
problem, but if the soil needs a large field to properly "perc" (as a lot of land is down there) the waste,
then we may have a bigger problem than we thought. I hope this is nothing or can be resolved easily.

As a precaution that a "perc test" had not been performed, yesterday I talked to someone in Southern
Arkansas about getting a "perc test" done. We should be able to get that person hired soon. As soon as
I get the results in writing, I will send you a copy of the report and we will see where we are at that
point.

Don

Donald K. Campbell, III

Almand, Orsi & Campbell, PLLC

211 Natural Resources Drive

Little Rock, AR 72205-1575

(501) 219-8500 (voice)

(501) 219-8585 (fax)

don@aoclegal.com

Exh L

**From:** McCullough, Lawrence - Little Rock, AR [mailto:Lawrence.McCullough@ar.usda.gov]
**Sent:** Friday, August 27, 2010 9:59 AM
**To:** Donald K. Campbell, III
**Cc:** Ivy, Cheryl - Little Rock, AR; Kindle, Larry - Monticello, AR; Vanlandingham, Mike - Little Rock, AR; Harris, Marisa - Pine Bluff, AR
**Subject:** FW: Helen Proctor's Percolation Test


From the correspondence included it is apparent we do not have a percolation test. Under normal circumstances the homeowner/contractor obtains the percolation test with approved system design prior to approval of the Rural Development Loan. In this case the family apparently wasn't advised to submit the results of the percolation test prior to their getting contractor's bids and architect's plans and specifications. The septic system was omitted from the architect's dwelling specifications. The contractor was advised and subsequently requested the additional $1800. We agree the percolation test should have been completed and approved by the State Health Department in advance of this loan's approval. A percolation test is urgently needed. Thanks.


**From:** Kindle, Larry - Monticello, AR
**Sent:** Friday, August 27, 2010 9:07 AM
**To:** McCullough, Lawrence - Little Rock, AR
**Cc:** Ivy, Cheryl - Little Rock, AR; Vanlandingham, Mike - Little Rock, AR; Harris, Marisa - Pine Bluff, AR
**Subject:** RE: Helen Proctor's Percolation Test


The dwelling isn't complete.  Therefore, once the percolation test is completed and the system is installed we will be in compliance with Arkansas Law.  We require the homeowner to provide our office a copy of the percolation test and  approved system design for our file.


*Larry D. Kindle*
Area Director
Monticello Area Office
870-367-8400  Ext.5
870-367-9186
larry.kindle@ar.usda.gov


**From:** McCullough, Lawrence - Little Rock, AR
**Sent:** Friday, August 27, 2010 8:59 AM
**To:** Kindle, Larry - Monticello, AR
**Cc:** Ivy, Cheryl - Little Rock, AR; Vanlandingham, Mike - Little Rock, AR; Harris, Marisa - Pine Bluff, AR
**Subject:** RE: Helen Proctor's Percolation Test


Aren't we required to insure compliance with State Health Dept. requirements relative to installing a septic system? Shouldn't we have the results of the perc test along with approved system design as a part of our office file. Was this ever required?


**From:** Kindle, Larry - Monticello, AR
**Sent:** Friday, August 27, 2010 8:26 AM
**To:** McCullough, Lawrence - Little Rock, AR
**Cc:** Ivy, Cheryl - Little Rock, AR; Vanlandingham, Mike - Little Rock, AR; Harris, Marisa - Pine Bluff, AR
**Subject:** Helen Proctor's Percolation Test

We don't have a copy of the percolation test or any additional information related to septic system.

*Larry D. Kindle*
Area Director
Monticello Area Office
870-367-8400  Ext.5
870-367-9186
larry.kindle@ar.usda.gov

-----Original Message-----
From: McCullough, Lawrence - Little Rock, AR
Sent: Friday, August 27, 2010 7:25 AM
To: Ivy, Cheryl - Little Rock, AR; Kindle, Larry - Monticello, AR
Cc: Vanlandingham, Mike - Little Rock, AR; Harris, Marisa - Pine Bluff, AR
Subject: FW: USDA Rural Development-LP Housing and Community Assistance

Please provide response. Thanks.

-----Original Message-----

From: Donald K. Campbell, III [mailto:don@aoclegal.com]

Sent: Thursday, August 26, 2010 5:38 PM

To: McCullough, Lawrence - Little Rock, AR

Cc: 'Anne Orsi'

Subject: RE: USDA Rural Development-LP Housing and Community Assistance

Mr. McCullough:

I have looked throughout our paper work and do not see a percolation test on

the soil for Ms. Proctor's property nor a report on the size of the field

needed to install a septic system for her house.  Do you have a copy of any

percolation test results and report on the field size needed to put in a

septic system in your records?  If so, could you send a copy of it to me.

If not, I am going to have to order one.

Don

Donald K. Campbell, III

Almand, Orsi & Campbell, PLLC

211 Natural Resources Drive

Little Rock, AR 72205-1575

(501) 219-8500 (voice)

(501) 219-8585 (fax)

don@aoclegal.com


This office attempts to keep its system virus free. However, we cannot, and

do not, guarantee any file or attachment sent by this office is virus free.

We strongly recommend any attachment be scanned with an updated virus

protection program before you download anything attached to this

transmission.

=====================================================================

THIS EMAIL IS COVERED BY THE ELECTRONIC COMMUNICATIONS PRIVACY ACT, 16

U.S.C. §§ 2510-2521, AND IS LEGALLY PRIVILEGED.  THE DOCUMENTATION

TRANSMITTED HEREWITH AND THE INFORMATION HEREIN CONTAINED IS INTENDED ONLY

FOR THE USE OF THE ADDRESSEE AND ARE CONFIDENTIAL UNDER THE ATTORNEY-CLIENT

PRIVILEGE OR OTHERWISE NOT SUBJECT TO DISCLOSURE. IF YOU ARE NOT THE

INTENDED RECIPIENT OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING THIS

TRANSMITTAL TO THE INTENDED RECIPIENT, ANY USE OF SAID DOCUMENTATION AND/OR

INFORMATION OR DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION,

IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR,

PLEASE NOTIFY US IMMEDIATELY BY REPLY E-MAIL OR CALLING (501) 219-8500 FOR

MORE INFORMATION.  PROMPTLY DELETE AND DESTROY THIS DOCUMENT AND ANY

ATTACHMENTS THERETO. THANK YOU.

=====================================================================


-----Original Message-----

From: McCullough, Lawrence - Little Rock, AR

[mailto:Lawrence.McCullough@ar.usda.gov]

Sent: Wednesday, August 18, 2010 11:26 AM

To: Donald K. Campbell, III

Cc: Ivy, Cheryl - Little Rock, AR; Kindle, Larry - Monticello, AR

Subject: USDA Rural Development-LP Housing and Community Assistance

http://www.rurdev.usda.gov/LP_Subject_HousingAndCommunityAssistance.html

We are a part of USDA, not HUD. Rural Development is our mission. We are made up of three agencies: Rural Housing Service (RHS), Rural Utility Services (RUS), and Rural Business and Cooperative Development (RBCD). The above web site should be helpful as it addresses the housing programs. If there are specific question we can reference specific instruction.

We are assured of your effort to find a contractor. It is important to remember to maintain insurance on the incomplete structure. Thanks for keeping us informed.



Exh 3





FOUNDATION PLAN

FOUNDATION DETAILS

RON LITTON
HOME DESIGNER, P.A.





**Ron Litton, Home Designer, P.A.**

**P. O. Box 720296**
**Byram,  MS  39272**

**Invoice**

| DATE | REF. NO. |
|---|---|
| 5/8/2008 | 555 |

| SHIP TO |
|---|
| Helen Proctor<br>528-A Porter Hill Road<br>Lake Village, AR |

| TERMS | REP | SHIP DATE | SHIP VIA |
|---|---|---|---|
| COD | REL | 5/8/2008 | UPS |

| DESCRIPTION | AMOUNT |
|---|---|
| 4 sets Plan No. 13551 | 950.00 |
| Plan certification, Helen Proctor, 528-A Porter Hill Road, Lake Village, Chicot Co., AR | 50.00 |
| Shipping | 30.00 |
| NOTE:  Ship one set to Hal Palmer, 6202 Leslie Drive, Charlotte, NC  28269 | |
| Ship 3 sets to USDA , Rural Dev., 419 West Gaines St., Suite 4, Monticello, AR  71655 | |

| | |
|---|---|
| **Subtotal** | $1,030.00 |
| **Sales Tax  (7.0%)** | $0.00 |
| **Total** | $1,030.00 |